Jacob Markowitz, J.
Plaintiff Warren Spahn, a baseball pitcher of wide renown and acclaim, seeks an injunction against the unauthorized publication of a book purporting to be his *220 biography, The Warren Spahn Story written by Milton J. Shapiro and published by Julian Messner, Inc., and damages for injuries sustained by reason of said publication and distribution.
Spahn alleges that the defendants are ‘[1] taking pecuniary advantage of plaintiff’s name, photographs, and likeness and private life to create for profit a fictionalized and dramatic story, fanciful, and sensational in nature, designed primarily and exclusively for entertainment value, and to thrill, adventurize, amuse and inspire [defendants’] reading public.” The present lawsuit is thus predicated upon the contention that the fictionalization of his life story, the inclusion in the book of aspects of his private life and the concomitant commercial exploitation of his name and likeness constitute an infringement of plaintiff’s “ Right of Privacy”.
Defendants urge that The Warren Spahn Story is not and cannot, consistent with section 8 of article I of the Constitution of the State of New York and the First Amendment to the Constitution of the United States, be deemed to be, within the proscriptions of article 5 (§§ 50, 51) of the Civil Rights Law.[1]
*221 While the essence of the right of privacy eludes precise verbal definition, it comprehends, in its pure form, the individual’s absolute dominion and control over his [1] ‘ inviolate personality” — the individual’s property right in his very being, whether manifested by his actions, his thoughts, his character, his appearance, his name. Dean Prosser, a leading authority in the law of torts, defines the law of privacy as comprising ‘ ‘ four distinct kinds of invasion of four different interests * * * 1. Intrusion upon the plaintiff’s seclusion or solitude, or into his private affairs. 2. Public disclosure of embarrassing private facts about the plaintiff. 3. Publicity which places the plaintiff in a false light in the public eye. 4. Appropriation, for the defendant’s advantage, of the plaintiff’s name or likeness.” (Prosser, Privacy, 48 Cal. L. Rev. 383, 389.)
New York law recognizes article 5 of the Civil Rights Law as the fountainhead of the right to legal redress for the invasion, appropriation and commercial exploitation of the individual’s personality (Gautier v. Pro-Football, 304 N. Y. 354, 358; Hill v. Hayes, 18 A D 2d 485, 488).
The New York statutory “ Right of Privacy ” represents the Legislature’s unequivocal response to the judicial pronouncement in the case of Roberson v. Rochester Folding Box Co. (171 N. Y. 538, 547) that “the right of privacy as a legal doctrine enforceable in equity has not, down to this time, been established by decisions.” An overwhelming majority of American jurisdictions has rejected the Roberson v. Rochester Folding Box Co. (supra) decision and reasoning and has recognized the right of privacy as a natural law, nonstatutory right. The juridical landmark of this corpus of the law is the justly venerated Pavesich v. New England Life Ins. Co. (122 Ga. 190). In that case, the court first enunciated the doctrine that the right of privacy was both a right ‘ derived from natural law ’ ’ (p. 194) and one “guaranteed to persons * * * by the constitution * * * of the United States ” (p. 197). “ If personal liberty embraces the right of publicity,” the court (p. 196) declared with reference to the First Amendment freedoms of expression, “it no less embraces the correlative right of privacy ”.
If in their views on the origin of the right of privacy, the New York statutory and the natural-right views represent differing protagonists, the case-law evolved by each jurisdiction closely parallels that of the other. The reason is clear. Article 5 of the Civil Rights Law couches the right of privacy and eon-,comitant proscription in the language of an all encompassing *222 imperative. Accordingly, the New York courts, mindful of the tenor of the times and the attendant needs of the individual, have moulded the corpus of the right of privacy doctrine. In so doing, the judiciary early adopted the guiding principle that “ £ [a] statute of this kind is not££ to be obeyed grudgingly, by construing it narrowly and treating it as though it did not exist for any purpose other than that embraced within the strict construction of its words. ” It is £ 1 not an alien intruder in the house of the common law, but a guest to be welcomed * * * as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to social needs.” ’ ” (Lahiri v. Daily Mirror, 162 Misc. 776, 779, quoted with favor in Flores v. Mosler Safe Co., 7 N Y 2d 276, 281.)
During its early formative years, the right of privacy was shaped to meet the protection needed against the excesses of “yellow journalism” and the unauthorized practices of advertising, then in their embryonic stages. Today, the right must be construed in the context of a society that cannot cavalierly dismiss the pragmatic realities of our day. 'Scientific advances have multiplied the potential for infringement of the individual’s sanctity, and the demands of our highly complex industrialized society dangerously engulf and threaten the perimeter of man’s ever-shrinking sphere of personal liberty.
These constant and increasing pressures upon the individual’s right to inviolate personality and dignity have awakened in us an acute awareness that even as against the State, the right of privacy represents but another facet of the fundamental rights to life, liberty and the pursuit of happiness — that the inalienable right of life must comprehend more than the antithesis of biological death; the right of liberty, more than the absence of physical restraint. If, in 1928, it required the prophetic perception of Mr. Justice Brandéis to discern that 1 £ The makers of our Constitution * * * conferred, as against the Government, the right to be let alone —the most comprehensive of rights and the right most valued by civilized men ” (dissenting in Olmstead v. United States, 277 U. S. 438, 478), the temper of our times has aroused a now receptive and understanding judiciary and public. Great rights, if not created, are perceived by man when he is threatened with their loss.
Present-day judicial cognizance that the essence of the Fourth Amendment is the individual’s right of privacy has spawned an incipient awareness that a general right to privacy is part of the 11 life ’ ’ and £ £ liberty ’ ’ protected by the due process clauses of the Fifth and Fourteenth Amendments.
*223 “ This notion of privacy ”, Mr. Justice Douglas has recently declared, “ is not drawn from the blue. It emanates from the totality of the constitutional scheme under which we live.” (Poe v. Ullmann, 367 U. S. 497, 521.) Indeed, within the very recent memory of man, recognition of the right of privacy has emerged as a distinguishing hallmark of our society.
The concept of a right of privacy as a constitutional right safeguarding the individual against unreasonable governmental action must be distinguished from the individual’s private law right of privacy against infringement by another individual. Nevertheless, it cannot be doubted that the stature and scope of- the private law right have been greatly enhanced by the recent development of its constitutional law counterpart. Thus, to construe the statutory right of privacy in a decimating fashion and without consideration of the present-day background and the newly-expanded constitutional right of privacy would relegate the law of New York to a petrified and outmoded position in a dynamic society.
This does not mean that the right of privacy is absolute. ‘‘ A legal system attains its end by recognizing certain interests, — individual, public, and social — by defining the limits within which these interests shall be recognized legally * * # and by endeavoring to secure the interests so recognized within the defined limits ” (Pound, Interests of Personality, 28 Harv. L. Rev. 343). The case by case delineation of the sphere of the individual’s right of privacy has been the handiwork of the judicial process.
In drawing this fine line of demarcation, the courts have been singularly aware that society’s interest in the preservation of the inviolate personality conflicts with the public interest in the free and unimpeded dissemination o-f news and of information (paraphrasing Gautier v. Pro-Football, 278 App. Div. 431, 436, affd. 304 N. Y. 354, supra). Defendants maintain (especially in the light of the recent pronouncement of the United States Supreme Court in New York Times Co. v. Sullivan, 376 U. S. 254), that freedom of the press is absolute and unconditional and that sections 50 and 51 of the Civil Rights Law, if applied to the author and publisher of a biography, are ‘ ‘ unconstitutional since they would violate the rights of Freedom of the Press under Article 1, section 8 of the Constitution of the State of New York and the First Amendment to the Constitution of the United States.”
Any contention that the matter now before this court falls within the purview of the Supreme Court interdiction in the New York Times Co. v. Sullivan case (supra) must be dis *224 missed. The Supreme Court in that case explicitly limited its decision. “ We hold today ”, the court said at page 283, “ that the Constitution delimits a State’s power to award damages for libel in actions brought by public officials against critics of their official conduct.” (Emphasis supplied.)
Of paramount importance, neither in New York Times v. Sullivan (supra) nor in any other case, has the high court adopted the absolutist view of the rights safeguarded by the First Amendment (see Kingsley Books v. Brown, 354 U. S. 436). To so classify freedom of the press as an unconditionally absolute right would inexorably relegate other rights to a deferred position. “ [W]e can establish no firsts without thereby establishing seconds ” (Mr. Justice Jackson dissenting in Brinegar v. United States, 338 U. S. 160, 180). The Founding Fathers well knew the value of freedom of the press as an indispensable safeguard for the security of our form of Government. They were equally profoundly committed to the principle that the ultimate purpose of our Government is to secure man’s “ unalienable rights ” among which are “ life, liberty and the pursuit of happiness ”. Neither may be completely and automatically subordinated to the other. (See Schwartz, The Supreme Court [1957], pp. 232-237.) Judicial protection of each of the fundamental tenets upon which our system of Government is founded “ is necessarily qualified by the requirements of the Constitution as an entirety for the maintenance of a free society” (Mr. Justice Frankfurter, concurring in Pennekamp v. Florida, 328 U. S. 331, 352).
In a leading right of privacy case (Barber v. Time, Inc., 348 Mo. 1199) in which defendant Time Magazine raised the same constitutional arguments propounded by the defendants in this case, Commissioner Hyde (later Chief Justice) aptly stated, at page 1206:
“freedom of the press was not created merely for the benefit of the press, but because it is essential to the preservation of free government and progress of civilization. * * * Therefore, the press, like individual citizens, must not abuse its constitutional rights or overlook its obligations to others.
‘ ‘ Thus, establishing conditions of liability for invasion of the right of privacy is a matter of harmonizing individual rights with community and social interests. * * * [T]hey can be harmonized on a reasonable basis, recognizing the right of privacy without abridging freedom of the press.”
It is in this context that the courts must, and have weighed and balanced, .the competing interests in each right of privacy controversy.
*225 Earlier courts in striving to achieve a point of equilibrium between the two antagonistic interests have bequeathed to us a heritage of judicial experience and guidance. From the beginning, the courts have consistently declared that items of current news and news reports concerning those who are the subject of news, whether public figures or otherwise, are exempt from the prohibitions of the “Right of Privacy ” statute. In like manner, the statute “ has been held not to apply to articles which, though not strictly news, are informative and educational and which make use of the names or pictures of living persons ” (Koussevitzky v. Allen, Towne & Heath, 188 Misc. 479, 482, affd. 272 App. Div. 759). These broad exceptions to the protective aegis of the ‘ ‘ Right of Privacy ’ ’ statute are predicated upon the society’s supreme commitment to the public’s “ Right to Know ’ ’, and the decisions reveal an extremely liberal interpretation of the scope of the public’s legitimate interest in the dissemination of current events and informative and educational matter.
Judicial refinement of the individual’s legal sanctuary, however, has not stripped him of the protective mantle of the law. Rather has it tailored his cloak to fit the individual’s dual role as an individual and as a member of our society. If the affairs of an individual fall within the purview of current news or information in which the community has a legitimate interest, the private individual’s status as a member of society attains dominance, and he is metamorphosed into a public figure who must yield his right of privacy to the interest of the public.
The juridical concept of the public figure vis-a-vis, the right of privacy has not been definitively enunciated despite a plethora of ad hoc responses to justiciable problems involving persons of renown. Initially, it must be emphasized that neither the natural law doctrine nor the Few York statute discriminates between a private and a public personage.
The right of privacy — the right in the “inviolate personality”— inheres in each individual. Of particular significance to a public figure is that facet of the right of privacy which, as the obverse of the right of withdrawal from the glare of public scrutiny, embraces the “right of publicity ”, the exclusive property interest in one’s name, portraiture and picture (Haelan Laboratories v. Topps Chewing Gum, 202 F. 2d 866, 868, cert. den. 346 U. S. 816). The law has long recognized that “ [a] man’s name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property” (Brown Chem. Co. v. Meyer, 139 U. S. 540, 544).
*226 Indeed, the very purpose of sections 50 and 51 is the prevention of “the use of an individual’s name [portraiture or picture] for commercial purposes without his consent ” (Orsini v. Eastern Wine Corp., 190 Misc. 235, 236). “ [T]he right protected is the right to be protected against the commercial exploitation of one’s personality” (Hill v. Hayes, 18 A D 2d 485, 488, supra; Gautier v. Pro-Football, 304 N. Y. 354, 358, supra).
The unauthorized use of another’s name and picture can no more be countenanced by the law than can the illegal appropriation for profit of any other form of another’s property. A prominent figure’s “ right of publicity ” (Haelan Laboratories v. Topps Chewing Gum, supra), the exclusive interest in the financial worth of one’s personality, constitutes a legally protected property interest. “ [W]here a cause of action under the civil rights statute has been established, damages may include recovery for a so-called ‘ property ’ interest inherent and inextricably interwoven in the individual’s personality”. (Shientag, J., in Gautier v. Pro-Football, 278 App. Div. 431, 438, supra; see Manger v. Kree Inst. of Electrolysis, 233 F. 2d 5, 9; Redmond, v. Columbia Pictures Corp., 277 N. Y. 707.)
The public figure’s right of privacy is, however, far from absolute.
“ Anyone becoming involved in matters of news interest must submit to the resulting publicity. Those seeking notoriety will be said to have waived, and those having it thrust upon them to have lost, their right to personal seclusion” (Hofstadter, The Development of the Bight of Privacy in New York [1954], p. 39) and to the exclusive property interest in the other facets of personality.
Such waiver or loss is neither absolute nor unconditional, but only pro tanto, i.e., only “ to whatever degree and in whatever connection a man’s life has ceased to be private, before the publication under consideration has been made ” (Warren and Brandéis, The Bight to Privacy, 4 Harv. L. Bev. 193, 215 [1890]; see Pavesich v. New England Life Ins. Co., supra, p. 218) in which the court said, “ even the President of the United States in the lofty position which he occupies has some rights in reference to matters of this kind, which he does not forfeit by aspiring to or accepting the highest office within the gift of the people of the several States.”
Manifestly, precise delineation of the line of demarcation between the private and the public areas of a public figure’s life and the concomitant finding of statutory protection or waiver must be determined upon each factual pattern.
*227 Even as to those aspects of one’s life deemed to he within the legitimate interest of the public, the use of an individual’s name, portrait or picture is legally restricted. Since the rationale of waiver or loss of the protection afforded by the right of privacy postulates the public’s right to know, the privilege of using another’s name, portrait or picture without permission exists only within the strict confines of the vindication of this public interest. An individual’s pro tanto waiver of his exclusive property interest and right in his personality is precisely commensurate with the extent of the legitimate interest of society.
Thus, “ [w]hile one who is a public figure or is presently newsworthy may be the proper subject of news or informative presentation, the privilege does not extend to commercialization of his personality through a form of treatment distinct from the dissemination of news or information” (Gautier v. Pro-Football, 304 N. Y. 354, 359, supra; see, to the same effect, Binns v. Vitagraph Co., 210 N. Y. 51; Sutton v. Hearst Corp., 277 App. Div. 155; Hill v. Hayes, 18 A D 2d 485, 491, supra). Society’s ‘ ‘ immunity granted in respect to informative matter does not extend to dramatized or fictionalized versions of the event reported” (Stetjer, J., concurring in Youssoupoff v. Columbia Broadcasting System, 19 A D 2d 865-866), nor may an author claim exemption from the proscriptions of the “Right of Privacy ’ ’ statute if the ‘ biography is fictional or novelized in character.” (Koussevitzky v. Allen, Towne & Heath, supra, p. 484.)
Application of the afore-stated juridical criteria to the testimony and evidence adduced at the trial establishes beyond cavil that publication of the book, The Warren Spahn Story, constitutes a violation of the prohibitions of section 51 of the Civil Rights Law. The breadth and depth of the offending characteristics of the book are so all-pervasive as to render impracticable their complete recitation without inordinately extending the length of this opinion. Accordingly, the court has limited itself to reference to but relatively few examples of the violating contents. The critical significance of even this small portion of the record emerges clearly when viewed within the perspective of the general nature of the book itself, for the whole tenor of The Warren Spahn Story is gauged to project a supposed close association with the hero and the format can best be characterized as a series of vividly picturesque and detailed incidents profusely highligted with dialogue.
Two chapters of the book are devoted to Spahn’s experiences in World War II. The book mistakenly states that Warren *228 Spahn had been decorated with the Bronze Star. In truth, Spahn had not been the recipient of this award, customarily bestowed for outstanding valor in war. Yet the whole tenor of the description of Spahn’s war experiences reflects this basic error. Plaintiff thus clearly established that the heroics attributed to him constituted a gross nonfactual and embarrassing distortion as did the description of the circumstances surrounding his being wounded. Sergeant Spahn was not in charge of “ supervision of the repairs ” (p. 10) of the Bridge at Remagen; Spahn did not go £ £ from man to man, urging them on” (p. 9); Sergeant Spahn did not go ££ into the town of Remagen to check with his company commander on his orders for the day” (p. 11) and, consequently, the whole description thereof is imaginary; Spahn had not “ raced out into the teeth of the enemy barrage ” (p. 13); and in addition to other untruthful statements surrounding his being wounded, Spahn was not “ rolled * * * onto a stretcher” (p. 14); but remained ambulatory at all times after treatment in the first-aid station.
In addition, Spahn successfully contested the accuracy of many salient factors regarding his experiences at Camp Gruber.
In like manner, the theme of those chapters which pertain to Spahn’s boyhood and teen-age life inaccurately portrays the dominant role of Spahn’s father in the selection of and training for a baseball career for plaintiff and the near symbiotic relationship between the two. Plaintiff successfully repudiated the purported factual bases presented in the book for this implication, e.g., the concentrated afternoon pitching practice sessions did not take place as described; it was not true that ‘[1] daily baseball sessions with his father were the rule during the season” (p. 16) nor consequently was the lengthy portrayal of these sessions accurate; the story of Ed Spahn’s promise and gift to Spahn of a new first baseman’s mitt never occurred; Spahn’s father did not teach the boy to pitch; plaintiff never consulted his father concerning the signing of his first baseball contract; his mother, not his father, signed the necessary legal papers. As a consequence, the lengthy and vividly descriptive scenes describing the author’s misconceptions of the foregoing basic facts must be classified as fictional.
As a further manifestation of the author’s invented conception of the relationship between Spahn and his father, the author devotes chapter four to a grim portrayal of the supposed grave psychological effect of Spahn’s injury to his elbow (which the author erroneously and repeatedly describes as a shoulder *229 injury) upon the elder Spahn. The book at page 42 describes the following conversation, allegedly between Spahn and his father’s physician:
“ ‘ This, well — breakdown let’s call it — might have happened at any time, for any number of similar reasons. No, Warren, it would be morally wrong, in my opinion, to fix the blame for your father’s illness on your misfortune.’
“ Warren, nodded grimly. [1] What you’re trying to tell me is it’s not my fault that it’s my fault, isn’t that right Doctor? That my getting hurt was kind of the straw that broke Pop’s back? ’ ”
Plaintiff categorically controverted the express references and innuendoes concerning his father’s illness which plaintiff described as a normal post-operative recovery, and defendants were unable to rebut his position. Consistent therewith, he unequivocally denied that the aforesaid scene or any resemblance thereto had, or could ever have, taken place. Consequently, the dramatic portrayal of the ‘ ‘ guilt-ridden ’ ’ son represents but another of the book’s interesting, artistic but undeniable flights into fantasy.
With respect to the plaintiff’s courtship and marriage, most aspects of the author’s presentation were emphatically branded by plaintiff as untrue; e.g., Spahn’s reaction to his now wife at their first meeting, the dramatization of supposed obstacles to their marriage plans and other difficulties. Particularly indicative of the highly romanticized and nonfactual version of this relationship is the following scene at pages 67-68 between Spahn and his fiancee depicting his surprise return from Europe:
“ The weeks passed and the Braves received no word from Warren. The season opened — and still no Spahn. Then, in Tulsa one evening, Lorene Southard was just sitting down to dinner when the doorbell rang. ‘ Now who can that be? ’ she said aloud to herself. She strode briskly across the room and opened the door. A startled cry escaped her lips.
“ ‘ Warren! ’ she gasped.
[1] ‘ ‘ Surprise! ’ Spahn cried. He swept Lorene off her feet and carried her into the room. ‘ Surprise! Surprise! ’ He kept shouting as he swung her around in his arms.
“ ‘ Warren! Warren! ’ she laughed and cried at the same time. ‘ Put me down! ’ ”
“ The two of them fell onto the sofa in a laughing tangle.”
In fact, Spahn telephoned Lorene of his arrival, was met at the train station by her, and both then went out to dinner.
*230 With respect to the book’s description of Spahn’s concern over the problems attendant upon the birth of his son, the plaintiff established that both in factual detail and conclusory import the following passages, amongst others, were false or grossly distorted:
“ whenever the Braves’ road games were against an eastern team, Warren flew home between pitching assignments to be with his wife ” (p. 85).
“ On the western swings, Warren sat fidgeting on the bench, Ms uneasy mind a thousand miles away. Often, in the middle of a game, he would bolt from the dugout, rush into the clubhouse and call home to assure himself that Lorene was alright. His pitching was so bad that he didn’t even make the National League’s All Star team that year ” (p. 85).
“ The pressure was on. All over. The Spahn’s child had been expected around the end of August, but the days went into September and still there was no sign. Warren was becoming frantic ” (p. 91).
Once again, the defendants were unable to overcome plaintiff’s factual objections to the recurrent portrayal of the “frantic” Spahn, the hypersensitive individual, emotionally overwhelmed by his personal problems to the detriment of his role as a member of a team.
Concerning the depiction of his baseball career, plaintiff rightfully took exception to a multitude of factual errors, distortions, and recitations out of context, which are so extensive and varied that in the interest of keeping the size of this opinion within the bounds of propriety, reference must be made to the record in the case. The court, however, feels that mention must be made of the fact that scenes and dialogue were invented by the author, inaccurately depicting plaintiff’s professional relationship with Casey Stengel, Jackie Bobinson, Lew Burdette, Phil Masi and with his teammates as a whole.
While untrue statements do not necessarily transform a book into the category of fiction, the all-pervasive distortions, inaccuracies, invented dialogue, and the narration of happenings out of context, clearly indicate, at the very least, a careless disregard for the responsibility of the press and within the context of this action, an abuse of the public’s limited privilege to inquire into an individual’6 life.
An equal degree of departure from any factual basis is presented by the introspective revelations and feelings on the part of the plaintiff, which passages are liberally sprinkled throughout the book. The plaintiff denies that he ever entertained these thoughts. Becitation, at random, of some of these *231 invented thoughts indicates the extreme, and the court finds, fanciful nature of their import:
“ ‘ This time I won’t let you down, Pop,’ he resolved as the cool stream bathed his dust-caked lips. ‘ This time I won’t let you down! ’ ” (p. 49),
“ His confidence began to slip. He wasn’t sure he could put the ball where he wanted to anymore. He was afraid to try for the comers, afraid to throw the fast balls, afraid he was through ” (p. 141).
“ The whole thing was in his mind. There was nothing to do but find his own way out of the trap he’d made for himself ” (p. 141).
“ Good thing the hitters didn’t know how bad my legs were last year, he thought after a while. They’d have bunted me right out of the league. As it was, they did a pretty good job of it, he recalled sourly. Only seventeen wins — first time he didn’t win twenty with Milwaukee — and fourteen losses” (p. 142).
‘ ‘ Then the feeling had turned to fear. Then desperation. Finally, he even began to feel a little sorry for himself ” (p. 144).
The full significance of these attributed thoughts and feelings emerges when viewed within the context of paragraphs implying plaintiff’s excessive interest in his own career as an individual and not as a member of a team and within the context of a recurrent implication and the express statement that Spahn was “ obviously on the verge of a breakdown ” (p. 94).
At the trial, the author testified that with regard to the writing of The Warren Spahn Story, he had never interviewed Mr. Spahn, any member of his family, friends, or any baseball player who knew the subject of the instant “biography”, nor did he attempt to obtain information from the Milwaukee Braves, the baseball .team of which plaintiff was, and is, a member. Newspaper articles, magazine stories and general background books constituted the sole source of the author’s factual bases for his work. The author admitted that he relied upon the “ accuracy ” and “ competency of the people whose articles I read.” Of even more crucial significance, the author stated, ‘ ‘ I created dialogue based upon a secondary source.”
That the foregoing procedure outlined by the author constitutes the customary practice affords no basis for legal justification of defendants’ transgression and appropriation of plaintiff’s name, portraiture and picture for purposes of trade. Nor, especially in view of the multitude of overlapping offending characteristics of the book, does the contract in which Spahn agreed “ that his picture may be taken for still photographs, *232 motion pictures or television at such times as the Club may designate and agrees that all rights in such pictures shall belong to the Club and may be used by the Club for publicity purposes in any manner it desires ” efface, insofar as the defendants are concerned, the line of demarcation between the permissible and forbidden areas of unauthorized publicizing of Spahn’s life (see Redmond v. Columbia Pictures Corp., 277 N. Y. 707, supra; Franklin v. Columbia Pictures Corp., 271 N. Y. 554; Feeney v. Young, 191 App. Div. 501; Loftus v. Greenwich Lithographing Co., 192 App. Div. 251).
The book, jacket and pictures were all published without Spahn’s consent. The court also finds that the record unequivocally establishes that the book publicizes areas of Warren Spahn’s personal and private life, albeit inaccurate and distorted, and consists of a host, a preponderant percentage, of factual errors, distortions and fanciful passages, only relatively few illustrative portions of which are specifically set forth herein. Although so tightly interwoven as to defy extrication of the one from the other, the offending characteristics of the book comprehend a nonfactual novelization of plaintiff’s alleged life story and an unauthorized intrusion into the private realms of the baseball pitcher’s life — all to Spahn’s humiliation and mental anguish.
The subject purported biography transgresses the bounds of legitimate public interest by its breadth of reportorial coverage of those areas of plaintiff’s life which defy classification as public, i.e., his deeply personal relationships with members of his immediate family and his introspective thoughts. Quantitatively, these trespasses upon plaintiff’s private life represent a substantial portion of .the book now under scrutiny. Qualitatively, the colorful portrayal of the intimate facets of Mr. Spahn’s relationship with his father and his wife and the revelations of his innermost thinking (e.g., the plaintiff’s crucial role in the highly emotional and psychological atmosphere enveloping his father’s illness, the detailed intimate courtship scenes and difficulties, plaintiff’s reaction to his wife’s troublesome pregnancy) in many instances places the reader in the uncomfortable position of an embarrassed interloper upon another’s private and personal domain.
Compounding the effect of these unlawful intrusions, plaintiff’s uncontroverted testimony and evidence establish that factual errors so pervade and permeate these areas as well as the entire book as to render the whole story an “ embroidered ” and “embellished” version of Mr. Spahn’s life (cf. Sidis v. F. R. Pub. Corp., 113 F. 2d 806 cert. den. 311 U. S. 711).
*233 Evaluation of the literary attainments of this work falls beyond the judicial province, but critically pivotal to the determination that the book violates the interdiction of article 5 of the Civil Rights Law is the compelling conclusion that the writing constitutes a product — a creation, both in form and content — of the author’s artistic imagination.
In effect then, the defendants have used Spahn’s name and pictures to enhance the marketability and financial success of the subject book of which approximately 16,000 copies were sold at the retail price of $3.25 per copy. (For a discussion of appropriation — unjust enrichment, see Gordon, Right of Property in Name, Likeness, Personality and History, 55 Nw. U. L. Rev. 553.)
To return to the four category definition of “Privacy” by Dean Prosser, defendants have (1) intruded upon the plaintiff’s solitude and into his private affairs, (2) disclosed embarrassing “ facts ” about the plaintiff, (3) placed the plaintiff in a false light in the public eye, and (4) appropriated, for defendants’ advantage, the plaintiff’s name and likeness. Such intrusion, disclosure and appropriation for commercial exploitation are proscribed by section 51 of the Civil Rights Law.
Accordingly, plaintiff is entitled to the relief sought; to wit, injunctive relief preventing the further publication and distribution of The Warren Spahn Story in all its aspects and phases and is entitled'to damages against both defendants in the sum of $10,000 and costs.

. § 50. Right of privacy.
A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor.
§ 51. Action for injunction and for damages.
Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person’s name, portrait or picture in such manner as is forbidden or declared to be unlawful by the last section, the jury, in its discretion, may award exemplary damages. But nothing contained in this act shall be so construed as to prevent any person, firm or corporation, practicing the profession of photography, from exhibiting in or about his or its establishment specimens of the work of such establishment, unless the same is continued by such person, firm or corporation after written notice objecting thereto has been given by the person portrayed; and nothing contained in this act shall be so construed as to prevent any person, firm or corporation from using the name, portrait or picture of any manufacturer or dealer in connection with the goods, wares and merchandise manufactured, produced or dealt in by him which he has sold or disposed of with such name, portrait or picture used in connection therewith; or from using the name, portrait or picture of any author, composer or artist in connection with his literary, musical or artistic productions which he has sold or disposed of with such name, portrait or picture used in connection therewith.