UNIVERSITY OF NOTRE DAME DU LAC et al., Respondents, v. TWENTIETH CENTURY-FOX FILM CORPORATION et al., Appellants.

First Department, February 9, 1965.

*Frederick W. R. Pride* and *Samuel I. Rosenman* of counsel (*Leo P. Larkin, Jr., Stanley Godofsky, Max Freund* and *Gilbert S. Edelson* on the brief; *Royall, Koegel & Rogers* and *Rosenman Colin Kaye Petschek & Freund,* attorneys), for Twentieth Century-Fox Film Corporation and others, appellants.

*William C. Scott* of counsel (*Donald W. Smith* with him on the brief; *Satterlee, Warfield & Stephens,* attorneys), for Doubleday & Company, Inc. and another, appellants.

*David W. Peck* of counsel (*John Dickey* and *John S. Allee* with him on the brief; *Sullivan & Cromwell,* attorneys), for respondents.

*Emanuel Redfield* for New York Civil Liberties Union, *amicus curiæ.*

*Weil, Gotshal & Manges* (*Horace S. Manges, Jacob F. Raskin* and *Marshall C. Berger* on the brief), for American Book Publishers Council, Inc., *amicus curiæ.*

BOTEIN, P. J. The University of Notre Dame Du Lac and its president, Father Theodore M. Hesburgh, have brought this action against various book publishers and film distributors to enjoin release and distribution of a motion picture entitled " John Goldfarb, Please Come Home " and further distribution of the published novel on which the picture is based. Defendants appeal from an order granting an injunction *pendente lite* and denying their motions to dismiss the complaint.

Novel and photoplay both fall in the category of broad farce in which, among other blunderbuss travesty, collegiate football is depicted as having attained such magnified importance today that it may affect religious barriers and influence international relationships. Among other objects of what defendants are pleased to term " satirical thrusts " are the United States State Department, Central Intelligence Agency, United States Information Agency and oil-rich Arabian royalty. Only a short sketch of a part of the plot need be given, to the extent it most immediately involves the University.

A king of the Moslem faith, ruler of the mythical Arab country of Fawzia, has a son who has enrolled as a student in a Catholic college, the plaintiff Notre Dame — inferentially because it is the image and exemplar of supremacy in football. Enraged because his son has been denied a place on the football team, the king determines on vengeance by forming a team at Fawz U of his own subjects which, he plans, will play the Notre Dame team and defeat it. To train his group of novices, the king impresses into service a former football star, known as Wrong-Way Goldfarb. Goldfarb, who is a Jew — to complete the plot's religious cycle — is an American aviator employed by the Central Intelligence Agency to fly over Russia but he has by mistake landed in Fawzia. The king demands that the United States arrange a game between Fawz U and Notre Dame as the price for allowing the United States to lease an air base in his country.

At the urging of the panic-stricken State Department, Notre Dame, after firm refusals, finally permits its players and coach to travel to Fawzia. There, on the eve of the game, they are dined by the king and witness an orgiastic entertainment provided by dancing girls from the royal harem. The culinary *piece de resistance* is spiced mongoose, renowned for its devastating effect on even more sophisticated digestive systems than those of American football players. The next day they engage in a wild burlesque of a football game with the Fawzians, losing it because of the distressing aftermath of the spiced mongoose and a variety of chicaneries practiced against Notre Dame by, among others, the chief of the Central Intelligence Agency, who acts as referee. Not the least credible incident of the game is the winning touchdown scored by the leading lady, an American reporter who enters the game at the last minute as a member of the Fawzian team. She is carried bodily over the goal line by a preposterous oil gusher which erupts on the football field.

I shall first discuss the individual plaintiffs' claim of violation of his right of privacy under sections 50 and 51 of the Civil Rights Law. Father Hesburgh is named in connection with two brief passages in the book, but not named at all in the film. In the book, a volume of 143 pages in the paperback edition, he is referred to by name at page 108 and again at pages 115–116 as the University official with whom the State Department is in communication. In our opinion these isolated references are of that fleeting and incidental nature which the Civil Rights Law does not find offensive (*Stillman* v. *Paramount Pictures Corp.*, 5 N Y 2d 994; *Damron* v. *Doubleday, Doran & Co.*, 133 Misc. 302,

affd. 226 App. Div. 796; *Moglen* v. *Varsity Pajamas,* 13 A D 2d 114). To the extent that Father Hesburgh's cause of action is based on the film, it fails for the additional reason that the film does not use his " name, portrait or picture ", the statutory test of identification (*Toscani* v. *Hersey,* 271 App. Div. 445, 448). We do not think this test is satisfied by the conjunction of the fact that the book names him and the fact that the cover pages of the paperback edition, which in no way refer to him or his coplaintiff, laud the film.

We have read the book, which is incorporated as an exhibit to the complaint, and at the request of the parties viewed a special showing of the moving picture. The name of Notre Dame, unlike that of Father Hesburgh, is employed frequently in both book and film; and there is not the slightest question that the references are to the plaintiff University. And there is no point whatsoever in disclosing our views as to the artistic merit, good taste or essential decency of the treatment accorded Notre Dame in the book and moving picture versions. As will be developed further on, cases of this nature may not be determined on such criteria.

The only critique we are permitted to make is a threshold one shaped by a consistent line of cases. It is this: Is there any basis for any inference on the part of rational readers or viewers that the antics engaging their attention are anything more than fiction or that the real Notre Dame is in some way associated with its fabrication or presentation? In our judgment there is none whatever. They know they are not seeing or reading about real Notre Dame happenings or actual Notre Dame characters; and there is nothing in text or film from which they could reasonably infer " connection or benefit to the institution " (*Cornell Univ.* v. *Messing Bakeries,* 285 App. Div. 490, 492, affd. 309 N. Y. 722). " ' Nobody is deceived. Nobody is confused.' " (*Germanow* v. *Standard Unbreakable Watch Crystals,* 283 N. Y. 1, 18), and plainly nobody was intended to be.

As will be seen, this conclusion imposes a heavy burden upon the University, which it must overcome in order to sustain its complaint.

Sections 50 and 51 of the Civil Rights Law protect only a " living person " (Hofstadter & Horowitz, Right of Privacy, § 51; Prosser, Torts [3d ed.], p. 843), and the University, an incorporated institution, does not rely on them. Under section 397 of the General Business Law (added by L. 1961, ch. 438) a nonprofit corporation such as the University may restrain the use of its name for advertising purposes or for purposes of

·trade. We are offered no convincing rebuttal of defendants' contention that this legislation was mainly designed to operate in connection with the sale of. goods and services, and in our view a situation like the present was remote from the Legislature's contemplation.*

Plaintiffs expressly state that the action is in no sense a libel action and that any libel involved is immaterial and besides the point. It is the doctrine of unfair competition on which the University principally relies; specifically, that defendants have illegally appropriated " the name, symbols, high prestige, reputation and good will of Notre Dame." As " palming off "— deception — is not an element here, the University finds no support in such authorities as *Cornell Univ.* v. *Messing Bakeries* (*supra*) or *Trustees of Columbia Univ.* v. *Axenfeld* (136 Misc. 831). In the latter case there was a finding that " defendants in adopting the name ' Columbia Educational Institute ' did so with the deliberate design of conveying to the public the impression that they were identical or associated with the plaintiff." Accordingly, plaintiff University invokes cases of the type exemplified by *Madison Sq. Garden Corp.* v. *Universal Pictures Co.* (255 App. Div. 459), in which defendant wove actual news photographs of plaintiff's hockey team in action into a moving picture with a fictional plot. Those cases, however, are distinguishable for the reason succinctly expressed in *Miller* v. *Universal Pictures Co.* (11 A D 2d 47, 49, 13 A D 2d 473, affd. 10 N Y 2d 972), where defendant made recordings simulating the style and manner of playing of an orchestra conducted by plaintiff's deceased husband — " in those cases the offending parties did not provide their own performances."

That the University's contentions outrun the precedents is not necessarily determinative. For, in holding in *Fisher* v. *Star Co.* (231 N. Y. 414, 427) that the exploitation by defendant of cartoon characters originated by plaintiff and imitated by defendant's employees was unfair to the public and plaintiff, the court went on to say: " The controlling question in all

---

* See Klein, Is Unauthorized Use of Titles of Artistic Works in Unrelated Fields Actionable Piracy?, 28 Brooklyn L. Rev. 59, note 1 [quoting in part the following paragraph from *Time,* April 21, 1961, p. 92: " The bill was introduced by Manhattan Republican Assemblyman John R. Brook at the request of the Metropolitan Opera and Carnegie Hall. It was none too soon to draw the line, said Brook. If the trend had been allowed to continue, he warned, ' we might soon have found such fine institutions as St. Patrick's Cathedral, the Red Cross, Columbia University or the American Legion linked with diapers, liquors and fertilizers.'"]; New York State Legislative Annual 1961, p. 72; Association of the Bar of the City of New York, Reports of Committee on State Legislation, 1960, p. 535; 1961, p. 411.

cases where the equitable power of the courts is invoked is, whether the acts complained of are fair or unfair." It is appropriate therefore to consider whether the defendants are engaging in a species of "parasitism" (*Electrolux Corp.* v. *Val-Worth,* 6 N Y 2d 556), or "commercial immorality" (*Dior* v. *Milton,* 9 Misc 2d 425, 434, affd. 2 A D 2d 878), warranting judicial condemnation. We think not. It is at once apparent, when we deal with the content of a book or motion picture, that we deal with no ordinary subject of commerce. Motion pictures, as well as books, are "a significant medium for the communication of ideas"; their importance "as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform" and like books, they are a constitutionally protected form of expression notwithstanding that "their production, distribution and exhibition is a large-scale business conducted for private profit" (*Joseph Burstyn, Inc.* v. *Wilson,* 343 U. S. 495, 501; *Jacobellis* v. *Ohio,* 378 U. S. 184, 187).

Defendants argue that injunctive relief would violate the First Amendment, but that is an issue we do not reach. It is permissible to express praise or derision of a college's athletic activities in a journal of news or opinion. If such a journal, a novel and a photoplay are on a parity in law as media of expression, extension of the doctrine of unfair competition to interdict praise or derision by means of the novel or the photoplay would seem without justification. Social cost may properly be considered in these matters (Developments in the Law — Competitive Torts, 74 Harv. L. Rev. 888, 941); and the granting of an injunction in this case would outlaw large areas heretofore deemed permissible subject matter for literature and the arts. To mention but one, there is the school or college novel, numerous examples of which are cited in the briefs. Use of fictitious names is no answer. Offended institutions would argue that they were readily identifiable, with the inhibiting effect on freedom of expression resulting from the apprehension of criminal or civil sanctions that would understandably be entertained by cautious souls in the chain of distribution to the public. This contingency has been deplored more than once in contexts not overly remote from the situation presented here (*New York Times Co.* v. *Sullivan,* 376 U. S. 254, 277; *Smith* v. *California,* 361 U. S. 147, 153, 154; *Farmers Union* v. *WDAY,* 360 U. S. 525, 530).

"What seems to one to be trash may have for others fleeting or even enduring values" (*Hannegan* v. *Esquire,* 327 U. S.

146, 158). "Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine" (*Winters* v. *New York*, 333 U. S. 507, 510). Accordingly, as intimated at the outset, we may not import the role of literary or dramatic critic into our functioning as Judges in this case; and so for purposes of the law we may not reach a conclusion that the works of fiction involved in this litigation are not artistic or literary works. Whether they are creations of merit, whether they have value only as entertainment and no value whatever as opinion, information or education, pose questions which would require us to stake out those elusive lines that we have been warned not to attempt in the cases above cited (see, also, *Molony* v. *Boy Comics Publishers*, 277 App. Div. 166, 171, VAN VOORHIS, J.). Whether "John Goldfarb, Please Come Home" is good burlesque or bad, penetrating satire or blundering buffoonery, is not for us to decide. It is fundamental that courts may not muffle expression by passing judgment on its skill or clumsiness, its sensitivity or coarseness; nor on whether it pains or pleases. It is enough that the work is a form of expression "deserving of substantial freedom—both as entertainment and as a form of social and literary criticism" (*Berlin* v. *E. C. Publications*, 329 F. 2d 541, 545, cert. den. 379 U. S. 822); and we are not prepared to hold that exercise of the freedom in the instant circumstances infringes on rights which equity should protect.

At bottom, it seems to us, the University's grievance, notwithstanding its disclaimer, sounds in defamation and its remedy, if it can prove libel, is at law (*Marlin Fire Arms Co.* v. *Shields*, 171 N. Y. 384).

We conclude that the order appealed from should be reversed, on the law, the injunction vacated and the complaint dismissed, with costs.

A 10-day stay from the entry of the order to be settled hereon should be granted.

RABIN, STEVENS, STEUER and WITMER, JJ., concur.

Order, entered on December 17, 1964, unanimously reversed, on the law, with $30 costs and disbursements to the appellants, the injunction vacated and the complaint dismissed. A 10-day stay from the entry of the order to be settled hereon is granted. Settle order on notice.