Rosalind HICKS, Agatha Christie, Ltd., and William Collins Sons & Co., Ltd., Plaintiffs,

v.

CASABLANCA RECORDS and Filmworks, First Artists Corporation, and Warner Brothers, Inc., Defendants.

Rosalind HICKS, Agatha Christie, Ltd., and William Collins Sons & Co., Ltd., Plaintiffs,

v.

BALLANTINE BOOKS, a division of Random House, Inc., Defendant.

Nos. 77 Civ. 5399, 78 Civ. 2042.

United States District Court, S. D. New York.

Sept. 19, 1978.

Marcia B. Paul, R. Andrew Boose, Greenbaum, Wolff & Ernst, New York City, for plaintiffs.

Michael J. Calvey, Coudert Brothers, New York City, for defendants Casablanca Records and Warner Brothers.

Kevin P. Hughes, Elise S. Solomon and Michael M. Meadvin, Weil, Gotshal & Manges, New York City, for defendant The First Artists Production Co., Ltd.

Robert M. Callagy, Nancy K. Cassidy, Peter W. Hursh, Satterlee & Stephens, New York City, for defendant Ballantine Books.

## OPINION

PIERCE, District Judge.

Plaintiffs, the heir and assignees of the late Agatha Christie, seek an order enjoining the defendant movie producers, Casablanca Records, Filmworks, First Artists and Warner Brothers (hereinafter referred to as the "movie case") from distributing or showing the motion picture "Agatha". Plaintiffs, in a related case, similarly seek an order enjoining defendant publisher, Ballantine Books (hereinafter referred to as the "book case") from distributing or making the book *Agatha* available to the public.

The defendants in both cases oppose the plaintiffs' applications for injunctive relief, and have separately moved to dismiss plaintiffs' claims on the ground that they fail to state claims upon which relief could be granted pursuant to Rule 12(b)(6) Fed.R. Civ.P.[1]

### Background

Plaintiffs' decedent and assignor was the late Dame Agatha Christie, one of the best-known mystery writers in modern times. Her career spanned five decades until her death in 1976, and culminated in the production of scores of mystery novels, not the least famous of which are *Murder on the Orient Express* and the short story, "Witness for the Prosecution." Although Mrs. Christie attempted to shun publicity with respect to her personal life, professionally, she cultivated the name "Agatha Christie" in such a way as to make it almost synonymous with mystery novels.[2] Thus, during her life, she agreed to the use of her name in connection with various motion pictures and plays based on her works. Upon her death, the rights in her works descended to plaintiff, Rosalind Christie Hicks, Mrs. Christie's sole legatee, and plaintiffs, Agatha Christie, Ltd. and William Collins Sons & Co., Ltd., her assignees.

1. By order dated November 10, 1977, Judge Weinfeld, sitting in Part One, denied plaintiffs' motion made in the movie case for a temporary restraining order. The defendants thereafter moved to dismiss the complaint pursuant to Rule 12(b)(1), (2), (3), and (6). Plaintiffs cross-moved pursuant to Rule 65(a)(2) for an order consolidating the hearing on the preliminary injunction with the trial on the merits. By order of this Court dated March 8, 1978, defendants' 12(b)(2) motion to dismiss was denied. Decision was reserved as to the other grounds. Plaintiffs' cross-motion to consolidate was granted.

For the reasons stated in the opinion, defendants' motion pursuant to 12(b)(1), *i. e.*, lack of jurisdiction over the subject matter, and 12(b)(3), *i. e.*, improper venue, are hereby denied.

The defendant in the book case has separately moved to dismiss the complaint pursuant to Rule 12(b)(6). The plaintiffs have cross-moved for a preliminary injunction. On July 11, 1978, a hearing on plaintiffs' motion for a preliminary injunction in the movie case was held along with oral argument on defendant Ballantine Books' motion to dismiss. With consent of the parties, evidence was taken in the book case. The Court reserved decision.

Accordingly, this opinion addresses the motions to dismiss made by the defendants in each case, and plaintiffs' motions for preliminary injunction made in each.

2. See Defendant's Exhibit, *Agatha Christie, An Autobiography*, at 269.

In the winter of 1977, defendants in the movie case began the filming of a movie entitled, "Agatha" which, like the book in the related case, presents a fictionalized account of a true incident which occurred during the life of Mrs. Christie. The book is scheduled for distribution shortly. Although both the movie and the book are entitled "Agatha", it is not disputed by defendants in either case that both concern the late mystery writer.

Plaintiffs, in seeking preliminary injunctions, have asserted their right to recover on the basis of the recently developing law of the right of publicity.[3]

It appears that on or about December 4, 1926, Mrs. Christie, then married to Colonel Archibald Christie, disappeared from her home in England. This disappearance was widely-publicized and, although a major effort was launched to find her, everyone was at a loss to explain her disappearance. However, eleven days after she was reported missing, Mrs. Christie reappeared, but her true whereabouts and the reasons for her disappearance are, to this day, a mystery.

In view of the death of Mrs. Christie, the public may never know the facts surrounding this incident, but should the defendants prevail herein, the public will have a fictionalized account of this disappearance as set forth in the movie and in the book.[4] In each instance, Mrs. Christie is portrayed as an emotionally unstable woman, who, during her eleven-day disappearance, engages in a sinister plot to murder her husband's mistress, in an attempt to regain the alienated affections of her husband. Given this portrayal of their decedent and assignor, plaintiffs, mindful of the personal nature of defamation and privacy actions, bring the instant actions alleging unfair competition and infringement of the right of publicity.

*Discussion*

■ This Circuit has recently addressed the parameters of the right of publicity in *Factors Etc., Inc. et al. v. Pro Arts, Inc. et al.*, 579 F.2d 215 (2d Cir. 1978) [hereinafter cited as *Factors*]. In *Factors*, the Court found that the right of publicity, *i. e.*, the right in the publicity value of one's name or likeness, is a valid property right which is transferable and capable of surviving the death of the owner. *Id.* at 220–21. However, the Court went on to state that this interest survives only if it is found that the owner "exploited" the right during his or her lifetime. *Id.* at 22 n.11; *accord, Guglielmi v. Spelling-Goldbert Prods.*, 73 Cal.App.3d 436, 140 Cal.Rptr. 775 (1977).[5] While the *Factors* opinion does not define "exploitation", it would appear that a party claiming the right must establish that the decedent acted in such a way as to evidence his or her own recognition of the extrinsic commercial value of his or her name or likeness, and manifested that recognition in some overt manner, *e. g.*, making an *inter vivos* transfer of the rights in the name (*Factors*), or posing for bubble gum cards (see *Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953)).

■ In applying the *Factors* analysis to the cases at bar, this Court finds for purposes of the present motions that plaintiffs have established that Mrs. Christie "exploited" her name during her lifetime. The plaintiffs have established that Mrs. Christie assigned rights to her literary works to plaintiff, Agatha Christie Ltd., and also bequeathed similar rights by testamentary disposition.[6] The Court notes that this evi-

---

**3.** During the past ten months, other courts in this circuit have been asked to resolve issues involving this nascent right. See, *e. g., Ali v. Playgirl, Inc.*, 447 F.Supp. 723 (S.D.N.Y.1978); *Price v. Worldivision Enterprises, Inc.*, 455 F.Supp. 252 (S.D.N.Y.1978); and *Factors Etc., Inc. v. Creative Card Co.*, 444 F.Supp. 279, Factors Etc., Inc. v. Pro Arts, Inc., 444 F.Supp. 288, *aff'd*, 579 F.2d 215 (2d Cir. 1978).

**4.** Defendants thus would be able to distribute both the novel and the movie without the consent of the plaintiffs.

**5.** See also, *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975).

**6.** The Court notes here that defendants allege that this assignment is not sufficient to consti-

dence, when considered together with evidence of contracts entered into by Mrs. Christie for the use of her name during her lifetime in connection with movies and plays based on her books, sufficiently establishes "exploitation". Thus, it seems clear as it pertains to the present motions that her right of publicity survived her death and was properly transferred to the plaintiffs as her heirs and assignees.

However, unlike the *Factors* case, our inquiry here does not end upon this finding that plaintiffs possess valid property rights. Here, the Court is faced with the novel and rather complex question of "whether the right of publicity attaches where the name or likeness is used in connection with a book or movie?" The question is novel in view of the fact that more so than posters, bubble gum cards, or some other such "merchandise", books and movies are vehicles through which ideas and opinions are disseminated and, as such, have enjoyed certain constitutional protections, not generally accorded "merchandise." It is complex because this Court is unaware of any other cases presenting a similar fact pattern or similar constitutional question with respect to this issue of the right of publicity. Thus, in search of guidance to resolve the issue presented herein, the Court has looked to cases involving the right of privacy pursuant to § 51 of the New York Civil Rights Act (McKinney 1976). While the right of publicity is not statutory, nevertheless both the rights of privacy and of publicity are intertwined due to the similarity between the nature of the interests protected by each (see W. Prosser, *Torts* 804 (4th ed. 1977)). Further, as a result of earlier interpretations of these rights (see generally for

a discussion thereof, *Ali v. Playgirl, Inc.*, 447 F.Supp. 723 (S.D.N.Y.1978)), it would appear that judicial interpretations with respect to the limits of the right of privacy could be helpful in determining the limitations, if any, to be placed on the right of publicity. Cf. *Factors, supra*, at 222 (for a discussion of the constitutional defense of "fair comment.").

■ The New York privacy statute, Civil Rights Law § 51, provides in pertinent part: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained . . . may maintain an equitable action . . . ."

In interpreting this provision, the New York State Supreme Court, Appellate Division, has held that:

"engrafted upon [the statute are] certain privileged uses or exemptions . . . [*i. e.*] matters of news, history, biography, and other factual subjects of public interest despite the necessary references to the names, portraits, identities, or histories of living persons." *Spahn v. Julian Messner, Inc.*, 23 A.D.2d 216, 219, 260 N.Y.S.2d 451, 453 (1st Dep't 1965) [hereinafter cited as *Spahn*].[7]

This Court finds that the same privileges and exemptions "engrafted" upon the privacy statute are engrafted upon the right of publicity.

■ In addressing defendants' argument that the book *Agatha* is a biography protected under *Spahn*, this Court, while noting that the affidavit of the author of the book details her investigation with respect to the "facts" surrounding the disappear-

---

tute "exploitation" because, as they interpret *Factors*, the Second Circuit requires that the grantor of the right must have exercised that right independently of the thing for which the grantor was known. They argue that the omission by the *Factors'* Court of any reference to assignments of movie rights made by the late Elvis Presley, the subject grantor in that case, supports their contention that the exploitation must take the form of merchandise or some such other product. See *Factors, supra*, at 215. Since the "omission" could have resulted from the failure of plaintiffs to produce such evi-

dence in the trial court, this Court does not attach the same significance to it as do defendants.

7. *Aff'd*, 18 N.Y.2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543 (1966), *judgment vacated and remanded in light of Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), 387 U.S. 239, 87 S.Ct. 1706, 18 L.Ed.2d 744 (1967), *aff'd on remand*, 21 N.Y.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967), *appeal dismissed*, 393 U.S. 1046, 89 S.Ct. 676, 21 L.Ed.2d 600 (1969).

ance, finds the book to be fiction, not biography. Indeed, defendant Ballantine Books' use of the word "novel" on the cover of the book, as well as the notable absence of any cited source or reference material therein, belie its contention that the book is a biography. Moreover, the only "facts" contained in the book appear to be the names of Mrs. Christie, her husband, her daughter, and Ms. Neeley; and that Mrs. Christie disappeared for eleven days. The remainder is mainly conjecture, surmise, and fiction. Accordingly, the Court finds that the defendants in both cases cannot avail themselves of the biography privilege in connection with the book or movie. Further since the book and the movie treat these few scant facts about the disappearance of Mrs. Christie as mere appendages to the main body of their fictional accounts, neither can be considered privileged as "fair comment" (see Hill, *Defamation and Privacy under the First Amendment*, 76 Col.L.Rev. 1205, 1277 (1976) [hereinafter cited as Hill]); or as "newsworthy" (see *Factors, supra*); or historical (see *Spahn, supra*.)

Thus, finding none of the *Spahn* privileges available to the defendants herein, the Court must next inquire as to whether the movie or the novel, as fictionalizations, are entitled to any constitutional protection. In so doing, it is noted that other courts, in addressing the scope of first amendment protections of speech, have engaged in a balancing test between society's interest in the speech for which protection is sought and the societal, commercial or governmental interests seeking to restrain such speech. See generally, *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Nimmer, *The Right to Speak from Times to Time; First Amendment Theory Applied to Libel and Misapplied to Privacy*, 56 Calif.L.Rev. 935 (1968). And unless there appears to be some countervailing legal or policy reason, courts have found the exercise of the right of speech to be protected. Thus, for instance, such a balancing test was employed by the Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) with respect to the law of defamation in relation to public figures. There, the Court found that speech, even though false, was protected unless it was shown that it was published "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280, 84 S.Ct. at 727. Here, this Court is of the opinion that the interests in the speech sought to be protected, *i. e.*, the movie and the novel, should be protected and that there are no countervailing legal or policy grounds against such protection. *Accord, Hill, supra*, at 1299.

In support of this position, resort is again made to cases in the privacy field, of which two are found to be particularly relevant: *Spahn*, cited *supra*, and *University of Notre Dame Du Lac v. Twentieth Century-Fox Film Corp.*, 22 A.D.2d 452, 256 N.Y.S.2d 301 (1965), *aff'd upon the opinion of the Appellate Division*, 15 N.Y.2d 940, 259 N.Y.S.2d 832, 207 N.E.2d 508 (1965) [hereinafter cited as *Notre Dame*]. The *Spahn* case, like the book case here, involved the distribution of a book which was presented by the defendant as being a biography of the well-known baseball player Warren Spahn. However, presented in the book were deliberate falsifications of events represented to be true, manufactured dialogue, and erroneous statistical data. Defendant argued that this material was presented in an effort to make the book more attractive to youngsters. Plaintiff sued on the ground that the book constituted a violation of his right of privacy under § 51. The New York Court of Appeals agreed, stating:

"We hold in conformity with our policy of construing sections 50 and 51 so as to fully protect free speech, that, before recovery by a public figure may be had for an unauthorized presentation of his life it must be shown, in addition to the other requirements of the statute, that the presentation is infected *with material and substantial falsification . . . or with a reckless disregard for the truth.*" *Spahn v. Julian Messner, Inc.*, 21 N.Y.2d 124, 127, 286 N.Y.S.2d 832, 834, 233 N.E.2d 840, 842 (1967) (emphasis supplied).

"To hold that this research effort [on the part of the author] entitled the defendants to publish the kind of knowing fictionalization presented here would amount to granting a literary license which is not only unnecessary to the protection of free speech but destructive of an individual's right—albeit a limited one in the case of a public figure—to be free of the commercial exploitation of his name . . . ." *Id.* at 129, 286 N.Y. S.2d at 836, 233 N.E.2d at 843.

The *Notre Dame* case involved the distribution of a movie, entitled, "John Golfarb, Please Come Home" which satirized modern-day events, people, and institutions, including a football team, identified as that of Notre Dame. Notre Dame University and its president, Father Hesburg, brought suit against the defendant pursuant to the New York Civil Rights Act and the common law on unfair competition. The Appellate Division, in denying the relief requested, stated:

"Motion pictures, as well as books, are 'a significant medium for the communication of ideas'; their importance 'as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform'; and like books, they are a constitutionally protected form of expression notwithstanding that 'their production, distribution and exhibition is a large-scale business conducted for private profit' [citations omitted]." *Notre Dame, supra,* 22 A.D.2d at 457, 256 N.Y. S.2d at 306.

And by way of dicta, the Court stated: "Defendants argue that injunctive relief would violate the First Amendment, but that is an issue we do not reach. It is permissible to express praise or derision of a college's athletic activities in a journal of news or opinion. If such a journal, a novel and a photoplay are on a parity in law as media of expression, extension of the doctrine of unfair competition to interdict praise or derision by means of the novel or photoplay would seem without justification. Social cost may properly be considered in these matters . . . and the granting of an injunction in this case would outlaw large areas heretofore deemed permissible subject matter for literature and the arts. . . ." *Id.*[8]

In applying the holdings of these two cases to those at bar, it would appear that the later decided *Spahn* case—which curiously did not cite *Notre Dame*—would dictate the result herein. However, upon closer scrutiny of *Spahn,* this Court is of the opinion that the *Spahn* holding should be and was intended to be limited to its facts, and that the result here should follow the holding in the *Notre Dame* case. See *Hill, supra,* at 1301 n.447. The Court reaches this conclusion based on the very language of the New York Court of Appeals' decision in *Spahn.* In essence, the Court in *Spahn* stressed the fact that the lower court had found that the defendant had engaged in deliberate falsifications of the circumstances surrounding the life of plaintiff and that such falsifications, which the reader might accept as true, were capable of presenting plaintiff in a false light. *Spahn v. Julian Messner, Inc.,* 18 N.Y.2d 324, 328, 274 N.Y. S.2d 877, 880, 221 N.E.2d 543 (1966) (citing opinion of the Appellate Division, 23 A.D.2d 216, 221, 260 N.Y.S.2d 451, 455 (1965) and citing the trial justice, 43 Misc.2d 219, 232, 250 N.Y.S.2d 529, 542 (1964)). Thus, the Court of Appeals in *Spahn* balanced the plaintiff's privacy rights against the first amendment protection of fictionalization *qua* falsification and, after finding there to be no such protection, held for the plaintiff. *Id.* See also *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Conversely, in the *Notre Dame* case, the Appellate Division, as affirmed by the New York Court of Appeals, found that the defendant had not represented the events in the movie to be true and that a viewer of the film would certainly know that the circumstances involved therein were fictitious; thus, the finding for the defendants.

8. Defendants' point to the developing literary genre involving fictionalization of the lives of deceased figures, *e. g., Burr* by Gore Vidal, to buttress their argument that if plaintiffs prevail publishers may be unable to publish such books.

■ It is clear from the review of these two cases that the absence or presence of deliberate falsifications or an attempt by a defendant to present the disputed events as true, determines whether the scales in this balancing process, shall tip in favor of or against protection of the speech at issue. Since the cases at bar are more factually similar to the *Notre Dame* case, i. e., there were no deliberate falsifications alleged by plaintiffs,[9] and the reader of the novel in the book case by the presence of the word "novel" would know that the work was fictitious, this Court finds that the first amendment protection usually accorded novels and movies outweighs whatever publicity rights plaintiffs may possess and for this reason their complaints must be dismissed.

■ Accordingly, the Court finds that the right of publicity does not attach here, where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious.

■ Plaintiffs also claim unfair competition pursuant to 15 U.S.C. § 1125(a) (1976). "To constitute an actionable tort under the statute, plaintiff must allege: (1) that 'goods or services' are involved, (2) that interstate commerce is affected, and (3) that there is a false designation of origin or a false description or representation." *CBS Inc. v. Springboard Int'l Records*, 429 F.Supp. 563, 566 (S.D.N.Y.1976). That the first two elements of the tort are present in the instant action is undisputed. Defendants do however dispute the presence of the third. "The gist of the action under this section is a use of the mark or tradename in interstate commerce which is likely to cause confusion or to deceive purchasers as to the source of origin of the goods." *Mortellito v. Nina of California, Inc.*, 335 F.Supp. 1288, 1294 (S.D.N.Y.1972).

Plaintiffs allege in both cases that the defendants' use of the name "Agatha" and "Agatha Christie" would cause confusion in the minds of the public in general, and Agatha Christie readers in particular, to the effect that the movie and novel were authorized or even written by Mrs. Christie. This Court does not agree and finds that plaintiffs "can prove no set of facts in support of [this] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80; *accord, CBS Inc. v. Springboard Int'l Records*, 429 F.Supp. 563, 567 (S.D.N.Y.1976). It too must therefore be dismissed.

Accordingly, plaintiffs' motion for a preliminary injunction in the movie case is denied for failure to establish likelihood of success on the merits (see *Sonesta Int'l Hotels Corp. v. Wellington Assocs.*, 483 F.2d 247 (2d Cir. 1973)); defendant Casablanca Records, First Artists and Warner Brothers' motions to dismiss are granted; defendant Ballantine Books' motion to dismiss in the book case is granted; plaintiffs' cross-motion for a preliminary injunction therein is denied for the same reasons set forth with respect to the movie case (*id.*).

The foregoing shall constitute the Court's findings of fact and conclusions of law in accordance with Rule 52(a) Fed.R.Civ.P.

SO ORDERED.

---

**9.** A copy of the movie script was furnished to plaintiffs; they have not alleged any deliberate falsifications by defendants.