OPINION OF THE COURT
Ethel B. Danzig, J.
Does a work of fiction, which concededly uses the real name and office of plaintiff (as well as others), purportedly to give the novel "a sense of historical accuracy”, run afoul of New York’s right to privacy statute?
Plaintiff, an Archbishop in the Roman Catholic Church, moves for an injunction restraining defendants, the book’s publisher and distributor, from using plaintiff’s name for any purpose in connection with a novel entitled In the Name of the Father, and requiring defendants to recall and destroy all copies of the novel within their control and any advertisements or promotion which refer to plaintiff.
Defendants cross-move to dismiss the complaint for failure to state a cause of action (CPLR 3211 [a] [7]) and to require plaintiff to post security (CPLR 8501, 8503).
1. Facts and Contentions of the Parties
Plaintiff is an American-born prelate who achieved notoriety when, as head of the so-called Vatican Bank, he was reportedly charged by Milan authorities of being associated with or an accessory to the 1982 collapse of Banco Ambrosiano. Defendants published and distributed a work of fiction entitled In the Name of the Father, by A. J. Quinnel (ironically, a pseudonym). The theme of the novel centers on the implementation of a plan developed by three Vatican officials, including plaintiff, to assassinate the late Soviet Premier, Yuri Andropov, so as to prevent further attempts on the Pope’s life. Plaintiff’s role is allegedly a prominent one, and, in fact, it is the character bearing his name and office, who conceives the plan and proposes it to his coconspirators.
In a prefatory note, the publisher states: "This book is a work of fiction. Names, characters, places, and incidents are used fictitiously, and any resemblance to actual persons, living *258 or dead, except as noted below, and actual events or locales is entirely coincidental. Some real people such as * * * Paul Marcinkus * * * appear as characters in the book to give a sense of historical accuracy. However, their actions and motivations are entirely fictitious and should not be considered real or factual.”
Plaintiff argues that his real name, office and background were appropriated to enhance the believability of the novel, thereby adding to its commercial viability. It was unnecessary, plaintiff alleges, to incorporate plaintiff’s name in the novel, and, in fact, in the edition published in the United Kingdom, another name was used for the character here portrayed with plaintiffs name.*
It is urged, further, that advertisements in local newspapers and in the book’s dust jacket improperly use plaintiffs name for commercial exploitation. For example, both an advertisement in the New York Times and the inside dust jacket contain, in prominent places, the following language: "Archbishop Paul Marcinkus leaned forward, lowered his voice, and said . . .”
In a letter dated September 11, 1987, plaintiff, through his attorneys, demanded that defendants "cease all use of his name for any purposes of trade or business whatever in and in connection with this book”, and that defendants discontinue all publication, distribution and advertising, and recall all copies previously delivered for sale.
2. The Instant Motion
In this motion, plaintiff argues that the use of his name for advertising purposes and for purposes of trade, not only without his consent, but in violation of his express disapproval, violates Civil Rights Law §§ 50 and 51. Defendants, it is contended, should therefore be enjoined pendente lite from using plaintiffs name and should be required to recall and destroy all copies of the book within their custody and control.
Defendants maintain that the use of living persons’ names for characters in works of fiction is not a use for advertising or trade as contemplated by the New York privacy statute, and that plaintiffs real life role as a member of the Vatican inner circle and his wide exposure in books and articles make *259 his inclusion in the novel "a perfectly logical choice” to give the story "a sense of historical accuracy.” Further, defendants argue that the Civil Rights Law cannot be invoked to enjoin a clearly labeled work of fiction, and to hold otherwise would have a devastating effect on the publishing world. Moreover, defendants contend that even if the Civil Rights Law does apply, since the novel disseminates information and fosters public discussion about Vatican activities, it should be afforded protection under the First Amendment. Defendants argue in addition, that since plaintiff is a public figure, actual malice must be shown before a recovery may be obtained or before a cause of action can be said to have been stated under the Civil Rights Law. Here, it is urged, no malice was intended, and plaintiff has surely been portrayed in harsher ways in other, nonfiction, books and articles.
Regarding the use of plaintiff’s name in advertising, defendants contend that such use was incidental, representing only a small amount of print advertising, and that, in any event, defendants "do not intend to use Marcinkus’ name in any further advertising.”
Lastly, it is urged, "an injunction and a recall would cost defendants nearly a million dollars in direct costs and lost sales as well as incalculable damage to its reputation in the publishing world.”
3. Principles of Law and the Parties’ Legal Arguments
In this State, no common-law right of privacy has been recognized, and the only available remedy is that created by the Civil Rights Law (Stephano v News Group Publ., 64 NY2d 174, 182; Arrington v New York Times Co., 55 NY2d 433, 440).
Section 50 of the Civil Rights Law provides: "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person * * * is guilty of a misdemeanor.” Section 51 creates a civil cause of action by permitting relief by injunction or damages: "Any person whose name, portrait or picture is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait or picture, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use”.
*260 Thus the central issue here, as in any case alleging a violation of New York’s privacy statute, is whether the appropriation of plaintiff’s name "was primarily for trade or advertising purposes within the meaning of the statute” (Freihofer v Hearst Corp., 65 NY2d 135, 140; cf., Prosser, Privacy, 48 Calif L Rev 383 [I960]; Restatement [Second] of Torts § 652A [1976] [where commercial appropriation, recognized in the New York privacy statute, is only 1 of 4 subdivisions of invasions of privacy]). A use for advertising purposes has been defined as "a use in, or as part of, an advertisement or solicitation for patronage” (Flores v Mosler Safe Co., 7 NY2d 276, 284), "intended to promote the sale of some collateral commodity or service” (Davis v High Socy. Mag., 90 AD2d 374, 379). The term "purposes of trade” is "not susceptible to ready definition” (Davis v High Socy. Mag., supra, at 379; Lahiri v Daily Mirror, 162 Misc 776, 780).
In an early case, the use of the name and likeness of a person in a movie dramatization of an actual event in which the person participated was held to violate the statute (Binns v Vitagraph Co., 210 NY 51). Binns, never overruled, reasoned that the pictures portrayed were not "true pictures of a current event but mainly a product of the imagination” (supra, 210 NY, at 56), and thus the use of the name and picture of the plaintiff was held to be one for business and profit and contrary to the statutory prohibition (supra, 210 NY, at 58).
One of the most prominent exceptions to the statute is where the person or event was newsworthy. The statute has consistently been held not to apply to publications concerning newsworthy events or matters of public interest (see, e.g., Stephano v News Group Publ., supra).
Another exception "is the rule that a public figure, whether he be such by choice or involuntarily, is subject to the often searching beam of publicity and that, in balance with the legitimate public interest, the law affords his privacy little protection”. (Spahn v Julian Messner, Inc., 18 NY2d 324, 328, vacated and remanded in light of Time, Inc. v Hill, 385 US 374, affd on remand 21 NY2d 124, appeal dismissed 393 US 1046.) A public figure does not, however, "surrender all right to privacy” and, while his privacy may be limited by the newsworthiness of his activities, he retains the right to have his personality free from commercial exploitation (Brinkley v Casablancas, 80 AD2d 428, 433).
*261 Thus in Spahn (supra), where an author dramatized certain events in the life of a famous baseball player, manipulating chronologies and manufacturing dialogues, purportedly to make his biography more appealing to the juvenile audience for whom it was intended, the New York Court of Appeals held that while factual reporting of newsworthy persons and events was protected, "[t]he fictitious is not” (Spahn v Julian Messner, Inc., 18 NY2d 324, 328, supra). Even upon remand for reconsideration in light of the standards set forth in New York Times Co. v Sullivan (376 US 254) and Time, Inc. v Hill (385 US 374, supra), where the court held that in addition to the other requirements of sections 50 and 51 of the Civil Rights Law, it must be shown, before recovery by a public figure may be had, "that the presentation is infected with material and substantial falsification and that the work was published with knowledge of such falsification or with a reckless disregard for the truth” (Spahn v Julian Messner, Inc., 21 NY2d 124, 127, supra), the test articulated was held to have been met. The author’s explanation as to why he falsified portions of the biography was held not to be a denial but rather an attempt at justification. As such the court found that the defendants were not entitled to publish that kind of "knowing fictionalization” (supra, 21 NY2d, at 129).
For plaintiff, the Spahn cases (supra) provide the basis for the rule he urges be applied here, to wit, that a knowing fictionalization, and surely an entire work of fiction, is actionable under Civil Rights Law § 51, even under the standards of New York Times v Sullivan (supra) and Time, Inc. v Hill (supra).
Defendants, however, respond that Spahn (supra) dealt with a juvenile biography that was proffered as true, and therefore, any fictionalized elements invaded plaintiff’s privacy and potentially held him up to ridicule. Here, it is urged, where the book is clearly labeled a novel, and the truth of the events depicted therein has been explicitly disclaimed, Spahn should not apply. Rather, defendants contend, University of Notre Dame Du Lac v Twentieth Century-Fox Film Corp. (22 AD2d 452, affd on opn of App Div 15 NY2d 940), which dealt with a novel and a motion picture, should control.
The plot in Notre Dame (supra), a "broad farce”, involved the king of a mythical Arab country, the State Department, the CIA, and the football team of Notre Dame. Notre Dame’s president sued under the Civil Rights Law, but the court *262 found the references to him in the book (he was not mentioned by name in the movie) to have been isolated, fleeting and of an incidental nature, and therefore not violative of the statute. The university, not a living person and, therefore, not protected by the statute, sued under theories of unfair competition and General Business Law § 397, whereby a nonprofit corporation could restrain the use of its name for purposes of advertising or trade. After finding these theories unavailing, the court still considered whether it should exercise its equity powers and enjoin the allegedly offending works.
The court found, on a threshold inquiry, that there was no basis for any inference that the works were anything but fiction and that there was no connection with real Notre Dame happenings or characters. Further, the court found that whatever its merits or weaknesses, the works, though fiction, were deserving of substantial freedom notwithstanding that their production " 'is a large-scale business conducted for private profit’ ”. (Supra, 22 AD2d, at 457.) In the final analysis, the court concluded, "the University’s grievance * * * sounds in defamation and its remedy, if it can prove libel, is at law” (supra, 22 AD2d, at 458).
While the discussion in Notre Dame (supra) was primarily under the unfair competition claim, it has been argued that "it is equally pertinent to a statutory claim based on invasion of privacy” (Hill, Defamation and Privacy Under the First Amendment, 76 Colo L Rev 1205, 1302, n 447). Thus, using New York case law under the privacy statute, the United States District Court in Hicks v Casablanca Records (464 F Supp 426, 433) found no right of privacy "where a fictionalized account of an event in the life of a public figure is depicted in a novel or a movie, and in such novel or movie it is evident to the public that the events so depicted are fictitious.”
In the Hicks case (supra), the heir and assignees of Agatha Christie sought to enjoin the distribution of a book and a movie depicting a fictionalized account of a real life event, to wit, an 11-day unexplained disappearance of Mrs. Christie in 1926. The District Court outlined the Spahn and Notre Dame cases (supra), and, finding that plaintiffs alleged no deliberate falsifications and that the reader, by the presence of the word novel, would know that the work was fictitious, held that the case before it was more similar to Notre Dame and therefore the balance tipped to protection of the speech at issue.
Here, too, defendants argue, the balance should tip in favor *263 of protection of their book, because it is also labeled a novel and contains a specific disclaimer stating that the acts of the characters therein are entirely fictitious and should not be considered real or factual.
4. Application of the Law to the Cross Motion to Dismiss
Applying the above principles to this case, it is apparent that neither the Spahn cases (supra) nor Notre Dame (supra) are dispositive. Unlike Spahn, a biography held out as depicting true events, the book here is a novel with a disclaimer stating that the actions and motivations of the characters named after real people are "entirely fictitious and should not be considered real or factual.” Yet unlike Notre Dame and Hicks (supra), where the court found that a reader would know the works were fictitious, defendants here have concededly included real people precisely in order to give the book "a sense of historical accuracy.” As the inside flap of the cover itself states, this book is "set on the cutting edge between documented fact and masterfully crafted fiction.” It cannot be said, as a matter of law, that even though this book is called a novel, and a work of fiction, that its readers will have no basis for believing that the work is "anything but fiction” and that there is no connection between the Archbishop in the book and plaintiff.
Further, defendants contend that the book is informative about Vatican affairs, and that it stimulates debate on the nature and role of those affairs. Plaintiff does not object to the subject matter of the novel in its informational content, but only to the use of his name. Nor is defendants’ urging that plaintiff should be considered a limited public figure of any avail. Even assuming that plaintiff is to be considered a limited public figure because of his participation in Vatican affairs, it is still arguable that the actual malice standard could be satisfied even though the work is labeled a fiction (Spahn v Julian Messner, Inc., supra). Defendants’ suggestion that the actual malice standard could not be met here because no malice was intended is unsupported in law and, at best, raises a question of fact which cannot be resolved on this record.
In addition, the complaint is sustained because of the use of plaintiff’s name on the inside flap of the cover and in the print advertising. To be sure, purely incidental advertising, such as the use of a reproduction of a public figure’s picture "to illustrate the quality and content of the periodical in which it *264 originally appeared” does not violate the statute, and, if such a conclusion can be reached easily enough on the facts, a determination to that effect can be made as a matter of law (Booth v Curtis Publ. Co., 15 AD2d 343, 350-352, affd without opn 11 NY2d 907; accord, Namath v Sports Illustrated, 48 AD2d 487, affd 39 NY2d 897). Thus, in Booth (supra), the acknowledged right of privacy of a well-known actress did not "protect her from true and fair presentation in the news or from incidental advertising of the news medium in which she was properly and fairly presented” (Booth v Curtis Publ. Co., supra, 15 AD2d, at 352). Similarly, because a publisher has a right to inform the public of the nature of the book being sold, a comparison of one author to another author of public renown, whose work is properly subject to comment, is of public interest, and does not violate the statute (Rand v Hearst Corp., 31 AD2d 406, 410; cf., Flores v Mosler Safe Co., supra; Reilly v Rapperswill Corp., 50 AD2d 342).
Here, however, it cannot be said as a matter of law that the use of plaintiff’s name in the book, on the cover and in the advertising does not violate the statute and therefore does not state a cause of action. Even if the underlying use was found not to violate the statute, the placing of plaintiff’s name in a prominent place and the quoting of statements from the book uttered by the character with plaintiff’s name and office raises the question as to whether or not defendants commercially appropriated his name. This is especially so in the print advertising where it cannot be immediately discerned that the quotation was not actually uttered by the plaintiff.
Accordingly, defendants’ cross motion to dismiss the complaint is denied.
5. The Request for Injunctive Relief
Although, under the statutory and case law outlined above, the complaint has been sustained, the granting of a preliminary injunction to recall all copies of the novel, etc., is by no means a foregone conclusion. First, the traditional analysis must be satisfied, and it is well settled that a party seeking preliminary injunctive relief must demonstrate a likelihood of success on the merits, a balancing of the equities in his favor and irreparable injury absent the granting of the relief requested (Albini v Solork Assocs., 37 AD2d 835). Further, it is well established that "[t]he drastic remedy of [a] temporary injunction is not to be granted unless a clear right [thereto] is established by the moving papers” (Park Terrace Caterers v *265 McDonough, 9 AD2d 113), and, in the absence of a clear right to the relief demanded, a preliminary injunction should not be granted until the issues are fully explored and resolved at trial (Town of Southeast v Gonnella, 26 AD2d 550).
Thus a lower court order granting a preliminary injunction was reversed by the Appellate Division, First Department, for failure "to show sufficient risk of irreparable harm that cannot be compensated for by money damages” and for failure to establish a clear right to the relief requested (Hansen v High Socy. Mag., 76 AD2d 812, revg 5 Media L Rep [BNA] 2398; see also, Hashim v Stein, 13 Media L Rep [BNA] 1651 [Sup Ct, NY County, Baer, J.], rejecting plaintiffs contention that he had an absolute right to an injunction).
Further, in conjunction with the standard analysis, the court must take into account the tensions presented when an individual’s privacy rights allegedly conflict with cherished First Amendment guarantees of freedom of speech and the free dissemination of matters of public interest. In such circumstances individual privacy rights must be balanced against such First Amendment guarantees.
Liability under New York’s privacy law for the use of a name or likeness in a work of fiction has been aptly described as "especially vexing” and "particularly incompatible with the first amendment” (Hill, Defamation and Privacy Under the First Amendment, 76 Colo L Rev 1205, 1277, 1299, 1304-1305). It has long been recognized that "[i]t is not for a court to pass on literary categories, or literary judgment” (Frosch v Grosset & Dunlap, 75 AD2d 768, 769). Thus, when requested to exercise its equitable powers to grant preliminary injunctive relief, it must be borne in mind that the instant book, whatever its literary merit or ultimate social value, is a work that is entitled to at least some degree of First Amendment protection.
To be sure, "[n]ot every prior restraint is prohibited” (Doe v Roe, 42 AD2d 559, 560, affd no opn 33 NY2d 902, cert dismissed as improvidently granted 420 US 307), and in fact, where a violation of the statute has been established or been conceded, the right to injunctive relief may be absolute regardless of relative damage to the parties (Onassis v Christian Dior N. Y., 122 Misc 2d 603, 607, affd 110 AD2d 1095; Durgom v Columbia Broadcasting Sys., 29 Misc 2d 394, 396 ["a denial of injunctive relief for a conceded violation of the statute would emasculate the provisions for injunctive relief and *266 cannot be justified”]; but see, Albert v New York Tel. Co., 28 Misc 2d 296, affd no opn 11 AD2d 656 [where the court held that even assuming a violation of Civil Rights Law §§ 50, 51, the exercise of sound discretion supported denying injunctive relief]).
Here, however, no violation of the statute has been established on the papers presented or conceded by defendant. Nor can it be said that plaintiff has shown a clear right to the relief sought. Defendants contend that the use of plaintiff’s name adds a sense of realism and thus excitement to the novel, and in the absence of a clear violation of the statute, this court will not second-guess them or attempt to exercise its own editorial opinion to say that the story could have been told just as effectively without using plaintiff’s name, no matter how the book may have been published in other jurisdictions.
Further, plaintiff has failed to demonstrate a balancing of the equities in his favor. The book does contain an express disclaimer to the effect that the actions and motivations portrayed are entirely fictitious and should not be considered real or factual. Defendants also contend that they will suffer a great monetary loss if forced to recall the books.
In sum, the request for a preliminary injunction ordering a recall of all copies of this novel is denied.
To the extent plaintiff seeks to enjoin use of the dust cover and the use of plaintiff’s name in print advertising, the request is similarly denied. The dust jacket labels the book a novel, and is attached to the book and the disclaimer contained therein, and thus it should follow the denial of injunctive relief for the book. Regarding the print advertising, defendants have represented that they no longer intend to run such advertisements, and plaintiff has not presented any evidence to the contrary.
Thus, upon the instant record, and under the New York precedents cited above, plaintiff’s motion for a preliminary injunction must be denied. Defendants’ cross motion to dismiss is similarly denied. Defendants’ request that security for costs be given is granted, and plaintiff is ordered to give security in the amount of $500 (CPLR 8501, 8503).
Counsel for both parties are directed to appear for a further conference in IA Part 12 and for oral argument on plaintiff’s pending motion for a protective order on January 25, 1987 at 2:00 p.m.

 According to a September 13, 1987 article in the New York Daily News the change in name was due to the insistence of the British publisher’s lawyer.