Andrea DWORKIN; Priscilla Moree;
Judith Fouts, Plaintiffs–Appellants,

v.

HUSTLER MAGAZINE INC., et al.,
Defendant–Appellee.

No. 87–6393.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 5, 1988.

Decided Jan. 24, 1989.

Gary L. Schockey, Spence, Moriarity & Shuster, Jackson, Wyo., for plaintiffs-appellants.

David O. Carson, Cooper, Epstein & Hurewitz, Kirk N. Sullivan, Beverly Hills, Cal., for defendant-appellee.

Appeal from the United States District Court for the Central District of California.

Before HALL and LEAVY, Circuit Judges, and PRO,[*] District Judge.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Andrea Dworkin is a prominent and outspoken feminist author and activist. She is a vocal advocate for the prohibition of pornography, and was one of the principal drafters of the ordinance against pornography enacted by the city of Indianapolis and struck down as unconstitutional. *See American Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323 (7th Cir.1985), *aff'd mem.,* 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). By her own admission, she is a public figure in this case. Hustler Magazine is a pornographic periodical. Much of its content consists of what we have recently described as "disgusting and distasteful abuse." *See Ault v. Hustler Magazine, Inc.,* 860 F.2d 877, 884 (9th Cir. 1988). It is frequently named as a defendant in lawsuits such as this. *See generally, e.g., Hustler Magazine v. Falwell,* — U.S. —, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Leidholdt v. L.F.P. Inc.,* 860 F.2d 890, 892 (9th Cir.1988) (citing cases); *Ault,* 860 F.2d at 877.

Predictably, Dworkin's beliefs and Hustler's editorial viewpoint are inimical to one another, and each party regards the other with hostility. In February, March, and December of 1984, Hustler published fea-

[*] Honorable Philip M. Pro, United States District Judge for the District of Nevada, sitting by designation.

tures mentioning Dworkin's name in a derogatory fashion. These features (the "Features") are the basis for the claims asserted in this case.

The February Feature is a cartoon, which, as described in the plaintiffs' complaint, "depicts two women engaged in a lesbian act of oral sex with the caption, 'You remind me so much of Andrea Dworkin, Edna. It's a dog-eat-dog world.'" The March Feature is a ten page pictorial consisting of photographs of women engaged in, among other things, acts of lesbianism or masturbation. Some of the photographs depict obviously staged scenes that include posed violence and phony blood. One photograph, supposedly of a Jewish male, has a caption stating: "While I'm teaching this little shiksa the joys of Yiddish, the Andrea Dworkin Fan Club begins some really *serious* suck-'n'-squat. Ready to give up the holy wafers for matzoh, yet, guys?" The December Feature was included in the "Porn from the Past" section of the magazine. It shows a man performing oral sex on an obese woman while he masturbates. A portion of the caption states: "We don't believe it for a minute, but one of our editors swears that this woman in the throes of ecstacy is the mother of radical feminist Andrea Dworkin."

Dworkin originally filed her complaint in Wyoming state court. With her as plaintiffs were Judith Fouts and Priscilla Moree, in their individual capacities and, respectively, as representatives of the Wyoming and the Jackson, Wyoming Chapters of the National Organization for Women ("NOW"). Fouts and Moree are also appellants here. The complaint named as defendants Hustler, Larry Flynt (Hustler's publisher), Inland Empire Periodicals, and Park Place Market. Appellants later amended their complaint to add as a defendant Flynt Distributing Company, Inc. (We will refer to Hustler, Flynt, and Flynt Distributing as the "Hustler defendants.") Inland Empire distributes Hustler in Wyoming and Park Place is a Wyoming retailer of the magazine. Moree, Fouts, Inland Empire, and Park Place are Wyoming citizens. The defendants filed a timely petition for removal to the District Court for the District of Wyoming, asserting both federal question and diversity jurisdiction. The removal petition asserted that all four Wyoming residents were fraudulently joined and should not be considered for purposes of determining diversity jurisdiction.

The Wyoming district court found "that removal was proper, based upon both federal question and diversity jurisdiction." *Dworkin v. Hustler Magazine, Inc.*, 611 F.Supp. 781, 788 (D.Wyo.1985). "Although the [Wyoming district court was] not totally convinced that plaintiffs Moree and Fouts [were] properly joined in th[e] action," it did not disregard their claims in finding that diversity jurisdiction existed. *Id.* at 785. Instead, the Wyoming district court found that Park Place was fraudulently joined, ignored its presence, and therefore found complete diversity. *Id.* at 787 (the court did not discuss Inland Empire, an unexplained omission).

The complaint contains Dworkin's claims of libel, invasion of privacy, intentional infliction of emotional injury, "outrage," and joint and several liability, as well as a less typical civil rights claim that Hustler and Flynt deprived her of her constitutional rights. On these claims Dworkin seeks recovery of $50 million in actual damages and $100 million in punitive damages. Moree and Fouts claim that publication of the Features: "is tantamount to a direct assault upon the rights and interests" of Moree, Fouts, and the relevant chapters of NOW; "has caused actual damages" to those persons and their associational rights, and causes irreparable harm to those persons; and "makes other women afraid to exercise [political freedoms on behalf of women] for fear of an ugly, pornographic representation of them appearing in such a magazine." Moree and Fouts seek pursuant to this claim damages in an unspecified amount and an injunction preventing Hustler "from using the name or likeness of any member of [the Wyoming or Jackson NOW] or any other woman in any article which is false, known to be false, or, if true, not published with good

intent and for justifiable ends." Finally, all three plaintiffs seek recovery pursuant to an implied private cause of action based on a Wyoming criminal obscenity statute.

Inland Empire and Park Place filed a motion to dismiss for failure to state a claim upon which relief could be granted. The Hustler defendants filed a Rule 12(c) motion for judgment on the pleadings as to Dworkin's constitutional rights count, Moree and Fouts' count, and the obscenity count, also on the ground that the complaint failed to state a claim. The Wyoming district court granted both motions, dismissing the claims against Inland Empire and Park Place, and the three counts attacked by the Hustler defendants' Rule 12(c) motion. *Dworkin v. Hustler Magazine, Inc.*, 634 F.Supp. 727, 731 (D.Wyo. 1986).

The Hustler defendants also sought a change of venue from the District of Wyoming to the Central District of California, which the Wyoming district court granted. *Dworkin v. Hustler Magazine, Inc.*, 647 F.Supp. 1278, 1283 (D.Wyo.1986). Prior to the change of venue, the Hustler defendants had filed a motion for summary judgment. This motion had been fully briefed, but was still pending at the time of the transfer. The California district court subsequently granted the motion in a Memorandum Opinion and Order and entered judgment in defendants' favor on all remaining claims. *Dworkin v. Hustler Magazine, Inc.*, 668 F.Supp. 1408 (C.D.Cal. 1987).

Appellants filed a notice of appeal taking their appeal from a number of the district court's procedural and substantive rulings. In their brief, however, appellants have abandoned most of their grounds for appeal. At this stage, appellants no longer contest any of the procedural orders. Moreover, appellants no longer contest the dismissal of Inland Empire or Park Place.[1] Accordingly, the only matters before us relate to the substantive merits of the Rule 12(c) dismissal and the summary judgment

in favor of the Hustler defendants. Two amicus briefs have been filed in support of appellants, one by Citizens for Decency Through Law, Inc., the other by Gloria Steinem and Susan Brownmiller. The amicus briefs also raise the merits of the district court's substantive decisions.

**I**

We review a summary judgment de novo. *E.g., Webb Co. v. First City Bank (In re Softalk Publishing Co.)*, 856 F.2d 1328, 1330 (9th Cir.1988). We also review the district court's decision to grant the Hustler defendants' Rule 12(c) motion de novo. The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing. Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog. In this case, the Hustler defendants' Rule 12(c) motion was equivalent to a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief could be granted, and de novo review is therefore appropriate. *See, e.g., Cadillac Fairview/California, Inc. v. Dow Chemical Co.*, 840 F.2d 691, 693 (9th Cir.1988) (observing that dismissal "for failure to state a claim upon which relief could be granted" is reviewed de novo, without mentioning Rule 12(b)(6)).

**II**

▮ The district court granted summary judgment on Dworkin's libel claims on two independent grounds. First, the court found that the Features could not reasonably be understood as expressing statements of fact about Dworkin, and therefore could not provide a basis for defamation liability. Second, the court found that even if the Features did contain false statements of fact, Dworkin had presented no evidence of malice as required by *New York Times v. Sullivan*, 376 U.S. 254, 84

---

1. The district court held that the Wyoming defendants were improperly joined and should not be considered for diversity purposes. *See, e.g., Pullman Co. v. Jenkins*, 305 U.S. 534, 541, 59

S.Ct. 347, 350, 83 L.Ed. 334 (1939). We construe appellants' failure to contest this point as acquiescence in the district court's decision, which we do not disturb.

S.Ct. 710, 11 L.Ed.2d 686 (1964) (*"New York Times* malice"), and therefore had failed to establish a genuine issue of material fact with respect to an issue on which she bore the burden of proof. If upheld, either of these conclusions would also dispose of Dworkin's intentional infliction of emotional distress [2] and false light privacy [3] claims.

### A

■ In our leading case on the fact-opinion distinction, *Koch v. Goldway,* 817 F.2d 507 (9th Cir.1987), we observed that "[s]tatements not themselves factual, and which do not suggest that a conclusion is being drawn from facts not disclosed in the statement, are commonly statements of opinion, not fact." *Id.* at 509. We have formulated a three-part test to guide our inquiry. *See Lewis v. Time, Inc.,* 710 F.2d 549, 553 (9th Cir.1983). The parties have also asked us to consider a Tenth Circuit case, which framed the question as "whether the [Features] could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated." *Pring v. Penthouse Int'l, Ltd.,* 695 F.2d 438, 442 (10th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983).

This case does not require a close inquiry on our part. *Ault* and *Leidholdt* are squarely in point, and lead to the conclusion that the Features consist of privileged opinion. *Ault* and *Leidholdt* point out that *Koch* directs us to examine the facts surrounding the publication, the context in which the statements were made, and the nature of the language used. As was the case in *Ault,* "[w]e think it clear that there is a heated and spirited debate on pornography," the extreme language to which Dworkin objects is "representative of the type of language generated in a dispute over such a subject," and the appearance of the language in a magazine known for its pornographic content "robs the statements of defamatory meaning." *Ault,* 860 F.2d at 881. Accordingly, as in *Ault* and *Leidholdt,* Hustler's statements in this case are privileged opinion.

An examination of a Hustler feature filed by appellants and amici Steinem and Brownmiller helps to illustrate this point. The work is entitled, "Hustler Interview: Gloria Steinem's Clit." This work contains a number of statements that by their terms can be read as statements of fact. Nevertheless, the article purports to be an interview of a body part, and therefore cannot be reasonably understood as making assertions of fact. By the same token, such

---

**2.** *Leidholdt,* 860 F.2d at 893; *Ault,* 860 F.2d at 880; *see Falwell,* 108 S.Ct. at 882. The district court, which rendered its decision before the Supreme Court handed down *Falwell,* properly granted summary judgment on Dworkin's emotional distress claims on a different ground. The district court reasoned, "[w]hatever the label, Dworkin cannot maintain a separate cause of action for mental and emotional distress where the gravamen is defamation." *Dworkin,* 668 F.Supp. at 1420. As we recently noted, "[a]n emotional distress claim based on the same facts as an unsuccessful libel claim cannot survive as an independent cause of action." *Leidholdt,* 860 F.2d at 893 n. 4.

Although the complaint sets forth separate counts for emotional distress and outrage, appellants have not differentiated these claims before us or the district court. The district court correctly held that these counts assert the same claim. "[T]he tort of outrage is not separable from intentional infliction of emotional distress." *Id.* at 892 n. 2.

**3.** *Leidholdt,* 860 F.2d at 893; *Ault,* 860 F.2d at 880; *see Time, Inc. v. Hill,* 385 U.S. 374, 390,

394, 87 S.Ct. 534, 543, 545, 17 L.Ed.2d 456 (1967). Furthermore, as with the emotional distress claim, Dworkin's false light privacy claim is "sufficiently duplicative of libel" as to be subsumed within it. *Leidholdt,* 860 F.2d at 893 n. 4. In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claim would be for defamation only, not false light privacy. *See Time,* 385 U.S. at 390–91, 87 S.Ct. at 543–44. In this case, Dworkin has strenuously argued that Hustler's statements are defamatory. Consequently, she has failed to state a false light claim; the false light aspects of her privacy claim are subsumed in her libel claims.

Finally, we note that New York has explicitly refused to adopt or to reject the tort of false light invasion of privacy. *E.g. Arrington v. New York Times Co.,* 55 N.Y.2d 433, 437, 449 N.Y.S. 2d 941, 945, 434 N.E.2d 1319, 1323 (1982). We hold that they would not adopt the tort in this case, either.

phrases as "pus bloated walking sphincter," "wacko," or "bizarre paranoia" were not reasonably understood as attributions of physical or mental disease to the plaintiff in *Leidholdt. See* 860 F.2d at 894. The statements about Dworkin contained in the Features are of the same ilk, and are not reasonably understood as statements of fact. Instead, they are privileged opinion.

Dworkin errs by limiting "opinion" to high-minded discourse. In this context, the word "opinion" is a label differentiating statements containing assertions of fact from those that do not. To differentiate among statements not of a factual nature would be at odds with fundamental principles of first amendment law, which seeks to facilitate the "search for truth" by encouraging "uninhibited, robust, and wide open" public debate, *New York Times,* 376 U.S. at 270, 84 S.Ct. at 721, and is informed by the notion that "there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). We agree with counsel for Dworkin that this means that outrageous and outlandish statements are sometimes protected, but do not share their alarm over this prospect. *See Cohen v. California,* 403 U.S. 15, 25–26, 91 S.Ct. 1780, 1788–1789, 29 L.Ed.2d 284 (1971) (first amendment protects the emotive content and function of expression, which "may often be the more important element of the overall message sought to be communicated"). Ludicrous statements are much less insidious and debilitating than falsities that bear the ring of truth. We have little doubt that the outrageous and the outlandish will be recognized for what they are.

■ Dworkin's suggestion that this issue is unsuitable for summary judgment lacks merit. We have held that "the distinction between alleged fact or opinion is a question of federal law." *Leidholdt,* 860 F.2d at 893; *accord Ault,* 860 F.2d at 880; *Koch,* 817 F.2d at 509; *see In re Yagman (Brown v. Baden),* 796 F.2d 1165, 1172 (9th Cir.1986) (affirming directed verdict), *cert. denied,* —— U.S. ——, 108 S.Ct. 450, 98 L.Ed.2d 390 (1987). The district court properly granted summary judgment on this ground.

**B**

■ The district court relied on its finding that Dworkin had failed to introduce evidence of *New York Times* malice as an alternate ground for summary judgment. Initially, it might seem that inquiring into the existence of *New York Times* malice is inconsistent with the conclusion that the Features contain no statements of fact. As the Supreme Court has noted, "[b]efore the test of reckless or knowing falsity can be met, there must be a false statement of fact." *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 2781, 41 L.Ed.2d 745 (1974)[4]; *see Falwell,* 108 S.Ct. at 883 (White, J., concurring in the judgment). The apparent inconsistency can be reconciled where the speaker intends his statements as outrageous parodies or caricatures expressing an opinion rather than making factual assertions. In that case, as counsel for Hustler points out, "there is no consciousness that [the speaker] is publishing something false, because [the speaker doesn't] think [he's] publishing a statement of fact." *New York Times* malice exists only if the defendant knowingly falsifies or "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *see Gertz,* 418 U.S. at 335 n. 6, 94 S.Ct. at 3005 n. 6 (*New York Times* requires "subjective awareness of probable falsity"). Therefore, if a speaker knowingly publishes a

---

**4.** *Letter Carriers* was primarily based not on the first amendment, but on federal labor statutes. *See id.* at 283 n. 15, 94 S.Ct. at 2781 n. 15. Nevertheless, the case explicitly applied first amendment principles. *Gertz* contains the leading expression in an exclusive first amendment context of the requirement that the statement must be of untrue fact:

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* 418 U.S. at 339–40, 94 S.Ct. at 3007.

literally untrue statement without holding the statement out as true, he may still lack subjective knowledge or recklessness as to the falsification of a statement of fact required by *New York Times*.

■ Turning to the present case, we agree with the district court's conclusion that "Dworkin persists in using the term 'malice' in its colloquial sense of 'spite' or 'ill-will.'" Even on appeal, the difference between *New York Times* malice and the lay meaning of the word "malice" eludes appellants. The Supreme Court has explicitly held that when a plaintiff must prove *New York Times* malice, "impos[ing] liability on the basis of the defendant's hatred, spite, ill will, or desire to injure [is] 'clearly impermissible.' '[I]ll will toward the plaintiff, or bad motives, are not elements of the *New York Times* standard.'" *Letter Carriers*, 418 U.S. at 281, 94 S.Ct. at 2779 (citations omitted). Because of Dworkin's faulty notion of *New York Times* malice, appellants have pointed to no evidence probative of *New York Times* malice, and there exists no genuine issue of fact.

■ Appellants' suggestion that the malice issue cannot be disposed on summary judgment lacks merit. The Supreme Court has held that the lack of *New York Times* malice is a proper ground for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

As a fallback position, Dworkin argues that "[t]he three publications about Andrea Dworkin make absolutely no comment on an issue of public concern." Dworkin then observes that the Supreme Court has not decided the degree of first amendment protection afforded to a defamatory statement of fact about a public figure but "involv[ing] no issue of public concern." Dworkin concludes that "defamatory comments made [about a public figure but] on issues not of public concern" disseminated in a "pornographic" publication should receive no first amendment protection. We disagree with both the characterization of the Features as "not of public concern" and the conclusion that public figure/private concern speech is completely unprotected by the first amendment.

1

■ Dworkin's own characterization of the Features belies the contention that they are "not of public concern." Dworkin is an influential and successful antipornography activist. Her activities have taken the form of advocacy and more direct political involvement. Dworkin participated in the drafting of the Indianapolis antipornography ordinance that was enacted and struck down as unconstitutional. *See generally Hudnut*, 771 F.2d 323. Dworkin herself points out: "Flynt also admitted that the work done on the Minneapolis Ordinance by Andrea Dworkin caused a great deal of problems for the pornography industry. Part of the reason that he attacked Andrea Dworkin was as a part of his campaign to fight the Minneapolis Ordinance against pornography."

As we noted above, the conflict about pornography is a matter of public concern, and the Features are a part of that conflict. The Features are attacks, ad hominem, to be sure, against an advocate of a political, social, and moral viewpoint contrary to Hustler's. They were uttered in the context of an ongoing political debate in which Dworkin was an active participant in efforts to outlaw the industry of which Hustler is a part. They seek to belittle Dworkin's viewpoint by vilifying its advocate. We have recently considered similar remarks contained in Hustler, and had no difficulty concluding "that there is a heated and spirited debate on pornography of which this [Hustler] article is a part, and in which epithets, fiery rhetoric and hyperbole are expected." *Ault*, 860 F.2d at 881; *accord Leidholdt*, 860 F.2d at 894.

To the same effect is the Supreme Court's recent decision in *Falwell*. In *Falwell*, Hustler had run a bogus "interview" with the prominent minister Falwell, in which Falwell had supposedly admitted to drunken incestuous intercourse with his mother in an outhouse, and which portrayed Falwell as an immoral hypocrite who preaches only when he is drunk. 108

S.Ct. at 878. The Court observed that vehement, and even "outrageous," criticism of public figures is a component of the "robust political debate encouraged by the First Amendment." *Id.* at 879. The Court then adopted the decisions of the courts below that the supposed interview contained no assertions of fact and concluded that the first amendment therefore prevented Falwell from recovering on his claim for intentional infliction of emotional distress as well as his claim for libel. 108 S.Ct. at 882–83.

*Falwell* makes clear that the Features do address matters of public concern. Accordingly, Dworkin's claims in this case are squarely within the rule of *New York Times*, which requires her to establish a question of fact as to malice on the part of Hustler. As we indicated above, this she has failed to do.

### 2

■ We also find fault with the second prong of Dworkin's argument that the first amendment does not protect appellees from defamation liability for publishing or distributing the Features. The Supreme Court has considered two distinctions in determining the extent to which the first amendment protects allegedly defamatory speech. These distinctions are (1) whether the allegedly defamed plaintiff is a public (or official) figure or is instead a private figure, and (2) whether the subject matter of the allegedly defamatory speech is a matter of public or of private concern.

A large body of case law establishes that the first amendment prohibits defamation liability[5] for otherwise protected speech, unless the speech contains a defamatory statement of untrue fact. *Letter Carriers*, 418 U.S. at 284, 94 S.Ct. at 2781. In *New York Times*, the Supreme Court held that in order to be actionable in a public figure/public concern case, the false statement of fact must have been uttered either with knowledge of its falsity or with reckless disregard of whether it was false or not. 376 U.S. at 279–80, 84 S.Ct. at 725–26. The Court addressed a private figure/public concern claim in *Gertz*, holding that in such a case the first amendment prevents the imposition of liability "without fault," *id.* 418 U.S. at 347, 94 S.Ct. at 3010, and also requires proof of *New York Times* malice before the plaintiff may recover presumed or punitive damages. *Id.* at 349, 94 S.Ct. at 3011. More recently, in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), a majority of the Justices opined that defamatory statements of untrue fact contained in private figure/private concern speech are unprotected by the first amendment.

Dworkin asks us to extend *Greenmoss* to public figure/private concern cases. This request rests on analytically faulty reasoning. Justice Powell's three-Justice opinion in *Greenmoss* framed the issue in terms of whether *Gertz*, a private figure/public concern case, should apply to a private figure/private concern statement. 472 U.S. at 757, 105 S.Ct. at 2944. Like *Gertz*, Justice Powell's *Greenmoss* opinion emphasized the differences between public and private figures. *Id.* at 756, 105 S.Ct. at 2944. Similarly, Justice White's opinion concurring in the judgment also emphasized the nature of the plaintiff rather than the subject matter of the speech. *Id.* at 772, 105 S.Ct. at 2952 (White, J., concurring in the judgment). Only Chief Justice Burger emphasized the distinction between matters of public and private concern, and even he framed the question as "whether *Gertz* applies." *Id.* at 764, 105 S.Ct. at 2948 (Burger, C.J., concurring in the judgment).

Because the Features were about a public figure, the point of departure in this case is not *Gertz*, but *New York Times; Greenmoss* is simply inapposite. The shield provided by *New York Times* wards the Features, and provides much heftier

---

5. Especially after *Falwell*, it seems likely that the requirement that the speech contain a false statement of fact applies not just to defamation claims, but to all claims seeking to impose civil liability for speech not otherwise outside the

protection of the first amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 348, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974) (the first amendment limits the state's ability to impose "civil liability" for speech).

safeguards than the *Gertz* standards the Supreme Court rejected in *Greenmoss.* Viewing the case in this light reveals another fundamental problem with appellants' logic; we doubt that it is possible to have speech about a public figure but not of public concern.

In *Gertz,* the Supreme Court stated that a plaintiff may become a public figure through "either of two alternative [means]."

> In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.

418 U.S. at 351, 94 S.Ct. at 3013.

Thus, Dworkin may be one of two types of public figures. First, she could be "a public personality for all aspects of [her] life." *Id.* at 352, 94 S.Ct. at 3013. If this were so, all speech about her would be of public concern. Second, she could be a public figure to an extent defined by "the nature and extent of [her] participation in the particular controversy giving rise to the defamation." *Id.* "Public controversies" within the meaning of *Gertz* are distinct from "controversies of interest to the public." *Time, Inc. v. Firestone,* 424 U.S. 448, 454, 96 S.Ct. 958, 965, 47 L.Ed.2d 154 (1976). An individual is a public figure not through involvement in mere "controversies of interest to the public," but only through participation in "public controversies"—i.e., matters of public concern. Therefore, if Dworkin is a public figure in this case it is only because the Features were of public concern.

Finally, even if we assume that Dworkin attacks statements in the Features that are not of public concern, *Falwell* indicates that they receive full-fledged *New York Times* protection. *Falwell* forecloses Dworkin's argument on the facts of this case.

### III

Although they have taken a variety of inconsistent positions through the course of this litigation, at oral argument counsel for Dworkin conceded that New York law governed her state law claims, including her invasion of privacy claims. In New York, Civil Rights Law § 51 is the exclusive private cause of action for invasion of privacy. Other than as provided in the Civil Rights Law, the courts of New York have "refus[ed] to countenance an action for invasion of privacy." *Arrington v. New York Times Co.,* 55 N.Y.2d 433, 435, 449 N.Y.S. 2d 941, 943, 434 N.E.2d 1319, 1321 (1982). The statute was "drafted narrowly to encompass only the commercial use of an individual's name or likeness and no more," *id.,* 449 N.Y.S.2d at 943, 434 N.E.2d at 1321, and has been narrowly construed by the courts of New York to protect only those commercial uses. *Id.* at 436, 449 N.Y.S.2d at 944, 434 N.E.2d at 1322. *Accord, e.g., Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 139, 490 N.Y.S.2d 735, 739, 480 N.E.2d 349, 353 (1985) (section 51 "grant[s] protection only to the extent of affording a remedy for commercial exploitation of an individual's name, portrait or picture, without written consent"); *see Leidholdt,* 860 F.2d at 895.

█ By its terms, section 51 prohibits appropriation only "for advertising purposes or for the purposes of trade." N.Y. Civil Rights Law § 51. Appellants cite a lower court case noting that "[t]he term 'purposes of trade' is 'not susceptible to ready definition.'" *Marcinkus v. NAL Pub. Inc.,* 138 Misc.2d 256, 522 N.Y.S.2d 1009, 1011 (N.Y.Sup.Ct.1987). Contrary to the position taken by appellants, however, that the defendant may have included the Features "solely or primarily to increase the circulation of its magazine and therefore its profits" "does not mean that the defendant[s] ha[ve] used [Dworkin's identity] for trade purposes within the meaning of the statute." *Stephano v. News Group Pubs., Inc.,* 64 N.Y.2d 174, 179, 485 N.Y. S.2d 220, 225, 474 N.E.2d 580, 585 (1984). Instead, it seems that two distinct types of

claims fit within the "purposes of trade" requirement of New York law.

■■■ The first type of claim is essentially identical to the common law "right of publicity," which protects proprietary interests in a manner analogous to copyright or patent law. *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977). New York has recently acknowledged this branch of section 51 in *Stephano.* There, the New York Court of Appeals noted that section 51 applies "in cases where the plaintiff generally seeks publicity, or uses his name, portrait, or picture, for commercial purposes." 64 N.Y.2d at 179, 485 N.Y. S.2d at 225, 474 N.E.2d at 585. *Zacchini,* which the *Stephano* court cited with approval, explained:

> the State's interest in permitting a "right of publicity" is in protecting the proprietary interest of the individual in his act in part to encourage such entertainment.... [T]he State's interest is closely analogous to the goals of patent and copyright law, focusing on the right of the individual to reap the reward of his endeavors.... [I]n "right of publicity" cases the only question is who gets to do the publishing. An entertainer ... usually has no objection to the widespread publication of his act as long as he gets the commercial benefit of such publication.

433 U.S. at 573, 97 S.Ct. at 2856.

The second branch of section 51 is a trademark analogy that has been identified by the lower courts of New York. *See also Spahn v. Julian Messner, Inc.*, 21 N.Y.2d 124, 286 N.Y.S.2d 832, 233 N.E.2d 840 (1967), *vacating* 18 N.Y.2d 324, 274 N.Y.S. 2d 877, 879, 221 N.E.2d 543, 545 (1966) (possibly applying this line of reasoning). This type of claim permits recovery for a use of the plaintiff's identity in a manner that "conveys or reasonably suggests the subject's endorsement of the publication in question." *Velez v. VV Pub. Corp.*, 135 A.D.2d 47, 50, 524 N.Y.S.2d 186, 189 (1988)

(citing *Booth v. Curtis Pub. Co.*, 15 A.D.2d 343, 223 N.Y.S.2d 737, *aff'd*, 11 N.Y.2d 907, 228 N.Y.S.2d 468, 182 N.E.2d 812 (1962)). *Marcinkus,* heavily relied upon by appellants, was this sort of case.

Dworkin does not and cannot plausibly argue that the cartoons constitute an appropriation by Hustler of the commercial benefit of a performance in which Dworkin has a proprietary interest or that the cartoons indicate her endorsement of Hustler. Therefore, we hold that Dworkin can not recover on any privacy theory recognized by New York.[6] *Accord Leidholdt,* 860 F.2d at 895 (Hustler's use of plaintiff's photograph was not "exclusively for Hustler's commercial gain," and plaintiff therefore failed to state a claim under New York Civil Rights Law section 51).

## IV

■■■ We next turn to appellants' claim of an implied private cause of action based on a Wyoming criminal obscenity statute. Normally, we would address the statutory question of whether appellants may assert such a cause of action before turning to the constitutional question of whether the first amendment permits a finding that the Features are obscene. We need not do so in this case because our earlier holdings have effectively answered that question.

Under the three-part test for obscenity of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), a publication may be obscene only if it appeals to the prurient interest, it depicts specifically defined sexual conduct in a patently offensive way, and, taken as a whole, it "lacks serious literary, artistic, political, or scientific value." *Id.* at 24, 93 S.Ct. at 2615. Because the Features expressed opinions about matters of public concern, they did not lack "serious literary, artistic, political, or scientific value." It follows that they are not obscene. *Cf. Falwell,* 108 S.Ct. at 882 ("the sort of expression involved in this case does not seem to us to be governed by

---

6. Dworkin also asserts a true light privacy, or public disclosure of private facts," theory. This claims fails under *Leidholdt,* in which we ob-

served that New York does not permit true light privacy claims. 860 F.2d at 895.

any exception to the general First Amendment principles").

■ Here, we also decline the invitation of appellants and amici to create a new category of expressive activity—non-obscene "pornography"—that is "not entitled to constitutional protection." Appellants and amici press this point by citing a number of cases holding that certain utterances are unprotected by the first amendment. In conjunction with these citations, they point out the harms that they believe pornography causes, equate the expressive activity of pornographers with "rape, batter[y], torture, brutaliz[ation] and sometimes kill[ing]" allegedly perpetrated by pornographers, and remark that pornographic expression is unworthy of protection. The view urged by appellants and amici runs contrary to fundamental first amendment principles, and we refuse to adopt it.

The *Miller* element requiring obscenity to lack "serious literary, artistic, political, or scientific value" focuses on the "worth" of allegedly obscene speech to determine whether it is protected by the first amendment.[7] By asking us to apply a less restrictive standard than *Miller*, appellants and amici ask us to permit the suppression of speech that *does* possess "serious literary, artistic, political, or scientific value." To do so would require us to flout the fundamental principle that the first amendment is designed to *foster* robust public debate on such matters. We refuse to do so.

■ By citing such cases as *Chaplinski v. New Hampshire*, 315 U.S. 568, 62 S.Ct.

766, 86 L.Ed. 1031 (1942), and *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), appellants and amici also seek to invoke the doctrines identifying categories of expression that may be regulated because of their tendency to cause others to engage in undesirable acts. As we noted in *Ault* and *Leidholdt*, Hustler's speech is not actionable simply because it is "base and malignant." *Leidholdt*, 860 F.2d at 894; *Ault*, 860 F.2d at 881. Numerous cases establish that speech may not be suppressed simply because it is offensive. *E.g.*, *Falwell*, 108 S.Ct. 876; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 211–12 & n. 6, 95 S.Ct. 2268, 2273–74 & n. 6, 45 L.Ed.2d 125 (1975) (absent captive audience, speech may not be regulated simply because it is offensive); *Cohen*, 403 U.S. at 16, 91 S.Ct. at 1783 ("Fuck the Draft" is protected); *Hess v. Indiana*, 414 U.S. 105, 107, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973) (per curiam) ("We'll take the fucking street later," or "We'll take the fucking street again" is protected); *see Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam) (racist advocacy by Ku Klux Klan); *Collin v. Smith*, 578 F.2d 1197 (7th Cir.) (Nazi march in Jewish community), *cert. denied*, 439 U.S. 916, 99 S.Ct. 291, 58 L.Ed. 2d 264 (1978). Instead, a large body of case law sharply limits the reach of these categories by requiring that the speech be directed toward and likely to incite imminent unlawful action. *See, e.g., Hess*, 414 U.S. at 108, 94 S.Ct. at 328; *Brandenburg*, 395 U.S. at 447, 89 S.Ct. at 1829. Appellants introduced no material evidence that Hustler is likely to cause imminent unlawful action[8] or, perhaps even more impor-

---

7. In *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the Court observed that obscenity is "utterly without redeeming social importance." *Id.* at 484, 77 S.Ct. at 1309. The plurality in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts*, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), incorporated this element into the definition of obscenity. *Id.* at 419, 86 S.Ct. at 977. In *Miller*, a majority of the Court adopted this approach, albeit in a modified form, and included as a part of the definition of obscenity the requirement that "the work, taken as a whole, [must] lack[ ] serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at

2615. The focus on "social importance" or "value" indicates a concern with the "worth" of the speech.

8. As we have noted above, a heated public debate currently rages about pornography. Some partisans in that debate contend that pornographic publications such as Hustler are likely to cause imminent unlawful action. Other partisans claim, with equal vigor, that pornographic publications do no such thing. At best, the scientific evidence concerning the causal relationship between pornographic materials and violent actions is ambiguous and unvalidated. Such equivocal evidence is insufficient to estab-

tantly, that Hustler is *directed* to producing or inciting such action. Accordingly, we reject this argument, as well.

## V

 As described by appellants, their civil rights claims assert that "the persistent attacks on Andrea Dworkin and other feminist anti-pornography leaders, such as Gloria Steinem, intimidated [appellants] and chilled their exercise of their own free speech rights. The crux of these claims was that these women were afraid to exercise their rights to speak out against pornography because if they did so they risked such vile and cruel portrayals of themselves as were levied against Andrea Dworkin and Gloria Steinem." In effect, appellants argue that Hustler and Flynt are subject to first amendment constraints in the same manner and to the same extent that state actors are.

Appellants' argument in support of this claim is virtually incoherent. It consists of little more than the unsupported assertion that a private actor violates the first amendment if he utters unprotected speech that has an adverse effect on the expressive activity of another. Nevertheless, we consider their argument as best we can.

Initially, we note that the claim of Moree and Fouts amounts to a group libel claim. The Supreme Court opinion in *Beauharnais v. Illinois*, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), is generally regarded as providing some support for group libel claims. The cases decided since *Beauharnais*, however, have substantially undercut this support. To the extent that *Beauharnais* can be read as endorsing group libel claims, it has been so weakened by subsequent cases such as *New York Times* that the Seventh Circuit has stated that these cases "had so washed away the foundations of *Beauharnais* that it cannot be considered authoritative." *Hudnut*, 771 F.2d at 331 n. 3; *see Collin*, 578 F.2d at 1205 (citing cases and expressing "doubt ... that *Beauharnais* remains good law at

all after the constitutional libel cases"). We agree with the Seventh Circuit that the permissibility of group libel claims is highly questionable at best. Accordingly, we share the district court's skepticism that Moree and Fouts were properly joined in this action, *see* 611 F.Supp. at 785.

 Nevertheless, we affirm the district court's dismissal on another ground. The district court dismissed Dworkin's civil rights claim because *"Hustler* Magazine and Larry Flynt are simply not state actors, and a plaintiff must plead state action in order to pursue a constitutional claim." 634 F.Supp. at 729. We agree with the district court, and affirm the dismissal of both Dworkin's claim and Moree and Fouts' claim on this ground. Appellants give no persuasive reason for taking the drastic step of abandoning the well-established state action doctrine. Rather than suppressing certain private viewpoints by treating them as if they were governmental, the first amendment requires other ideas to compete with those viewpoints, *e.g., Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007, in "uninhibited, robust, and wide-open" public debate, *New York Times*, 376 U.S. at 270, 84 S.Ct. at 721.

## VI

Appellees have requested double costs and attorneys' fees pursuant to Federal Rule of Appellate Procedure 38 and 28 U.S.C. § 1912. We have "discretion to award attorney's fees and costs as a sanction against a frivolous appeal. An appeal is frivolous if the result is obvious, or the arguments of error are wholly without merit." *DeWitt v. Western Pac. R.R. Co.,* 719 F.2d 1448, 1451 (9th Cir.1983).

We denied a similar request made by Hustler in *Leidholdt*, 860 F.2d at 895–86. Consequently, sanctions would be inappropriate in this appeal, which was filed under circumstances substantially similar to those of *Leidholdt.* However, the arguments made in this case have now been rejected

---

lish the "clear and present danger" required in order for any of the exceptions to general first

amendment principles to apply.

by this court in *Leidholdt, Ault,* and in this case. Should litigants raise similar contentions in subsequent cases, the courts hearing those cases may consider in the first instance whether sanctions are appropriate.

### VII

The judgment of the district court is AFFIRMED. The request for double costs and attorneys' fees on appeal is DENIED.